## UNITED STATES v. KING.

*(Circuit Court, E. D. New York. February 24, 1888.)*

**1. HOMICIDE—MURDER—WITHIN MILITARY RESERVATION—DEFINITION.**
Rev. St. U S. § 5339, provides that "every person who commits murder within any fort * * * under the exclusive jurisdiction of the United States * * * shall suffer death." *Held*, the statute not defining the offense of murder, that the common law, as it was in England before the Revolution, and as it has since been interpreted in our courts, must be looked to for a definition, and as there defined, murder is where a person of sound memory and discretion unlawfully and feloniously kills any human being in the peace of the sovereign, with malice prepense or aforethought, express or implied.

**2. SAME—BOUNDARIES OF RESERVATION.**
On the trial of an indictment for murder alleged to have been committed at Fort Hamilton, in New York harbor, it was in evidence that the fatal shot was fired 100 feet inside a certain fence on the line of Hamilton avenue. The prosecution introduced a deed to the United States of a certain plot of ground, and also the act of the New York legislature covering the same plot. This was followed by testimony that the military authorities of the United States had for years past exercised acts of ownership and jurisdiction over the same ground, which was in the village of Fort Hamilton, adjacent to and inside of the said fence. Certain maps of the premises, sworn to by those who made them, were then put in evidence. *Held*, that if the jury believed the testimony of those who made the maps, and also believed that the natural and artificial monuments that they found on the soil when the maps were made coincided in location with the monuments, artificial and natural, that were placed there when the deed was given and the act of cession was passed, they were warranted in finding that the fence on the line of Hamilton avenue was substantially coincident with the property-line and the line of jurisdiction of the United States.

**3. SAME—ARTICLES OF WAR.**
Where the man killed is a civilian, and the killing is done in a government fort, by a private soldier when off duty, requests bearing upon the subject of the ground being a military post, and of the rules governing the servce, the articles of war, etc., have no bearing upon the case, and are properly refused.

**4. SAME—BREACH OF MILITARY REGULATION.**
It appeared upon the trial of a private soldier charged with a murder committed by him upon a military reservation, that the soldiers stationed there were frequently allowed to go out and come in without a pass. It was also in evidence that there were many saloons in the neighborhood. *Held*, that this fact, though "to the prejudice of good order and military discipline," within the meaning of articles of war, (article 62,) should not work to the prejudice of the accused, who had availed himself of the privilege on the night of the murder.

**5. SAME—JUSTIFIABLE HOMICIDE—WHAT CONSTITUTES.**

W., the deceased, had attacked one M., a member **of the regiment to which** K. the accused, was attached as a private, and in the course of the affray had pursued him into the government reservation at Fort Hamilton, in New York harbor, where he got him down, and beat him so that M. cried out, "Murder!" and "Don't kill me!" K., who was a friend of M., and also upon good terms with W., saw the attack upon M., and heard his cries. He hastened to his quarters, got a rifle and two cartridges,—one ball and one blank,—and returning to the place of the encounter. which M. had left, he saw W., who was a powerful man, and aggressive when in liquor, as he then was, following M. up. He called to W. to leave the reservation, and did not load his piece until W., who continued to advance with a knife in his hand, and with threats that he was going "to do him [K.] up," was within eight feet of him. W. came on so rapidly that K. had no chance to raise his rifle, and he only discharged it when W. was against the muzzle, and at the moment of the discharge, the piece had not reached the horizontal. but was held just above the hip. The load was the ball cartridge, and W. was killed. The plea was justifiable homicide. *Held*, that to support the plea it was necessary that K. must have retreated as far as he could have done with safety to himself; that the danger of death or grievous bodily harm to himself or M. must have been apparently imminent, and that K.'s belief as to the character of the danger must have been honest, and founded upon grounds reasonable under the circumstances.[1]

**6. SAME—MANSLAUGHTER.**

The difference between manslaughter and excusable homicide is this: "In excusable homicide the slayer could not escape if he would; in manslaughter he would not escape if he could."

**7. SAME—INTOXICATION.**

Where intoxication at the moment is set up as a defense to a charge of murder, it is for the jury to determine whether or not the accused was at that time capable of a specific intent to take life.[2]

**8. SAME—EVIDENCE—RES GESTÆ.**

Since the admission of the testimony of the accused in his own behalf. the rule of *res gestæ*, as applied to his own declarations, is not so rigidly enforced, the jury being properly charged as to its weight.[3]

**9. SAME—DECLARATIONS OF ACCUSED.**

No weight is to be given to a declaration by the accused, unless the jury are satisfied that it was made at a time when it was forced out as the utterance of truth by the particular event itself. and at a period of time so closely connected with the transaction that there has been no opportunity for subsequent reflection or determination as to what it might or might not be wise for the declarant to say.[3]

**10. SAME—REASONABLE DOUBT.**

A reasonable doubt is a doubt based on reason, and one which is reasonable in view of all the evidence.[4]

---

[1] As to when a homicide is justifiable, see, also, People v. Robertson, (Cal.) 8 Pac. Rep. 600, and note; State v. Donnelly, (Iowa,) 27 N. W. Rep. 369, and note; Darbey v. State, (Ga.) 3 S. E. Rep. 663; Lynch v. State, (Tex.) 6 S. W. Rep. 190; Stanley v. Com., (Ky.) Id. 155; Duncan v. State, (Ark.) Id. 164; Fallin v. State, (Ala.) 3 South. Rep. 525.

[2] Voluntary intoxication is no excuse for a crime; but evidence of drunkenness is admissible upon the question of the intent of the defendant, where intent is an element in the constitution of the offense charged. State v. Lowe, (Mo.) 5 S. W. Rep. 889; State v. Mowry, (Kan.) 15 Pac. Rep. 282; Buckhannon v. Com., (Ky.) 5 S. W. Rep. 358, and note.

[3] As to when a declaration is admissible as part of the *res gestæ*, see Dismukes v. State, (Ala.) 3 South. Rep. 671.

[4] A reasonable doubt is one for which a sensible man can give a good reason, based on the evidence or want of evidence. It is such a doubt as a sensible man would act upon, or decline to act upon, in his own concerns. U. S. v. Jones, 31 Fed. Rep. 718. Respecting "reasonable doubt" in criminal cases, see Knarr's Appeal, (Pa.) 9 Atl. Rep. 878; People v. Lee Sare Bo, (Cal.) 14 Pac. Rep. 310; McCullough v. State, (Tex.) 5 S. W. Rep. 175; White v. State, (Tex.) 3 S. W. Rep. 710, and note; U. S. v. Jackson, 29 Fed. Rep. 503, and note; People v. Kernaghan, (Cal.) 14 Pac. Rep. 566; Cowan v. State, (Neb.) 35 N. W. Rep. 405; State v. Robinson, (S. C.) 4 S. E. Rep. 570; Kidd v. State, (Ala.) 3 South. Rep. 442; State v. Maher, (Iowa,) 37 N. W. Rep. 2.

Indictment for murder, under Rev. St. U. S. § 5339. That section provides that "every person who commits murder within any fort, arsenal, dock-yard, magazine, or in any other place or district of country under the exclusive jurisdiction of the United States, * * * shall suffer death."

Francis H. King, the accused, a private in the Fifth artillery, U. S. A., stationed at Fort Hamilton, New York harbor, was indicted for the murder of Ryan H. Willis, a civilian. The indictment was presented in the district court, and by order under Rev. St. U. S. § 1039, remitted to the circuit court for trial. The facts in evidence were briefly as follows: About 11:30 P. M. of November 26, 1887, Willis, while upon Hamilton avenue, a public thoroughfare adjoining the government reservation, assaulted one Marshall, an enlisted man attached to prisoner's regiment as a bandsman. He struck Marshall one or two heavy blows, whereupon the latter broke away, climbed over the fence, and had gotten about 20 feet beyond it upon the reservation when Willis, who had followed in pursuit, came up with him, knocked him down, and, holding him on the ground, continued to batter and pound him till three of Willis' friends pulled him off, and an acquaintance of Marshall led the latter off to his quarters, about 300 feet further on. While on the ground Marshall uttered loud cries of "Murder;" "Don't kill me;" repeating them certainly twice, if not oftener. After Marshall was led away, Willis, boisterously anxious to continue his assault, pursued his way over the reservation grounds, surrounded by his friends,—who were endeavoring to induce him to desist,—until within a short distance of the barracks of Battery I, to which command the prisoner was attached. Willis was a powerful man, aggressive, quarrelsome, and violent when under the influence of liquor, as he manifestly was that night. The prisoner, who had always been on good terms with Willis, parted from him with friendly "good nights" at the door of a liquor saloon a few moments before the encounter with Marshall. King proceeded to the fence, and crossed it not far from the place where Marshall and Willis crossed. He saw the attack on Marshall, and heard his cries. According to his own story, he at once hastened to his quarters to get a rifle, hoping thus to terrify Willis and the others, and by this means save Marshall. King was in uniform. Upon reaching his quarters, and while taking a rifle from the rack in the dormitory, he woke up a fellow-soldier, who took the gun from him. There was a conflict of testimony between this soldier and the prisoner,—the one stating that King, with tears in his eyes, asked him for cartridges, saying: "You don't want to see me killed, do you;" the prisoner denying that he asked for cartridges, and saying that he spoke only of the risk of Marshall being killed. From the adjoining dormitory he finally secured a gun and two cartridges,—one ball and one blank,— and hurried again to the ground. Here, as he testified, he saw Willis and his three companions, Willis advancing towards him with loud threats and vile expressions, shouting that he "had a root to do [him] up;" that "he [Willis] could shoot as well as he [King;]" and that he "would kill him deader than hell." King called to them to leave the government

land. He stood his ground as Willis advanced, with his piece pointing downward. He further testified that he did not load till Willis was within eight feet of him, and had raised his hand with a knife in it, and that the advance upon him was so quick that his piece had not reached the horizontal (held still just above the hip) after closing the breech-block before Willis was against the muzzle, and he fired. The evidence as to the events succeeding the departure of Marshall was very conflicting; some of it tending to support the prisoner's story, and some contradicting it. The prisoner swore that when he went out with the rifle he supposed Marshall was still lying helpless on the ground. It was bright moonlight, but a mist or fog was rising from the ground to the height of about 18 inches.

*Mark D. Wilber*, Dist. Atty., and *Mr. Devenny*, Asst. Dist. Atty., for the United States.

*Isaac S. Catlin*, for King.

LACOMBE, J., (*charging jury.*) Gentlemen of the jury, it is the duty of the court, as you know, to instruct or charge you as to the law of the case. In doing so courts frequently refer to the facts,—review them, and present them to the jury with their instructions as to the law. Such a course is not necessary, I think, in this case, because the facts are very few, and you certainly have them all within your recollection. I shall not weary you, therefore, with any general review of them; and inasmuch as it would be certainly unwise, if not improper, for the court to undertake to present to you any of the material facts without presenting them all, I shall merely instruct you as to the law applicable to cases such as this, with sufficient fullness, I hope, to enable you to handle the facts satisfactorily and conveniently when you reach your room. It is not unusual, in trials of this kind, to call the attention of the jury to the importance of the particular case they may have in charge. It is hardly necessary to do that here. You are intelligent men. You must fully understand how absolutely essential it is to the preservation of the social system in a civilized state that the laws should be enforced; especially so in the case of acts of violence. The laws must be obeyed; offenders must be punished; and that juryman would be faithless to his trust who, in a case where the facts convicted, should bring in a verdict contrary to the facts. On the other hand, your responsibility in this case will be impressed upon you more forcibly by your experience than it would by any words of mine. For upward of a week you have sat within 25 feet of the prisoner at the bar, conscious of the fact that for him the issues of life and death are in your hands. If that solemn fact has not impressed you with a sense of the responsibility you owe to your consciences, and your oaths that the verdict you may render shall be honest, intelligent, and careful, nothing that I might say would do so, "though I spoke with the tongue of men and angels."

The prisoner at the bar, Francis H. King, is indicted for murder, and you are to answer the question as to his guilt or innocence. The fact of slaying being undisputed here, there are only three possible answers

which you can give to that question: You may find him guilty of murder as charged in the indictment, and in that case your verdict would be, "Guilty." You may find him not guilty of murder as charged in the indictment, but guilty of manslaughter; in that case your verdict would be, "Not guilty of murder, but guilty of manslaughter." You may find that he was not guilty of either offense, but that the homicide was excusable, and in that case your verdict would be, "Not guilty." You see, therefore, that at the outset of your deliberations there are certain technical words placed before you which must be defined, and before I go further I shall read to you the definitions of these words:

*Murder.* The Revised Statutes of the United States[1] prescribe a penalty for any person who commits murder within any fort or other place or district of country under the exclusive jurisdiction of the United States. But the statutes do not define the offense of murder. Therefore we must turn to the common law, as it was in England before the Revolution, and has been interpreted since by our courts, for a definition of that crime. It is this: Murder is where a person of sound memory and discretion unlawfully and feloniously kills any human being in the peace of the sovereign, with malice prepense or aforethought, express or implied.

*Manslaughter.* Manslaughter is defined in the United States Revised Statutes, which in section 5341, prescribe that every person who, within any of the places or upon any of the waters described in the section that I first read, to-wit, any fort, arsenal, etc.,—every person who there unlawfully and willfully, but without malice, strikes, stabs, wounds, or shoots at, or otherwise injures another, of which striking. stabbing, wounding, shooting, or other injury such other person dies, is guilty of the crime of manslaughter. That is the definition of "manslaughter."

You will observe that the distinction between the two, is that in the one malice is present, and in the other it is absent. It is therefore necessary to define that word.

*Malice.* Malice is defined as "an intent to do injury to another," or, "a design formed of doing mischief to another."

The other word or term which calls for definition at the outset is "excusable homicide." Homicide, of course, as you know, is the killing of one human being by another human being. Excusable homicide, so far as anything in this case requires its definition, is the killing of another in self-defense.

Now, perhaps, by this time you appreciate the fact that these definitions are hardly as satisfactory as they might be; nor is that surprising. A cane, a table, a chair,—any object that we look at in this room,—we can by the use of a few words define in a manner satisfactory to ourselves. When, however, we come to deal with crime, we deal largely with mental processes, and with the actions of the human heart; and eminent jurists, laboring for centuries, have been unable to prepare a definition of these crimes which, without further explanation, will enable a jury of 12 men to take it, and apply it to the facts of any case. Therefore, as we proceed with these instructions I shall again recur to

---

[1] Rev. St. U. S. § 5339.

these definitions, and give them such elaboration as may be necessary to enable you to see exactly what the offenses are. I shall probably best assist you if I trace over and point out to you the course which you may most conveniently pursue in your deliberations when considering the issues raised in this case.

The first thing to be determined is the death,—that Ryan Willis was killed,—and the way in which he was killed. Of course you are relieved of any trouble in that particular by the facts in the case, and the concessions and the statements of the prisoner himself. There is no dispute but that Ryan Willis came to his death by a ball discharged from a Springfield rifle held at the time in the hands of Francis H. King. The place where he was thus slain becomes material, because, as you will remember, the penalty was prescribed against one who commits murder within any fort, arsenal, place, or district of country under the exclusive jurisdiction of the United States. A deed has been put in evidence here to the United States, covering a certain plot of land. An act of the legislature of the state of New York has been read, covering also a plot of land. There is testimony that the military authorities of the United States have for years past exercised acts of ownership and of jurisdiction over a certain plot of land in the village of Fort Hamilton, lying adjacent to, and inside of—if I may use the expression—a certain fence on the line of Hamilton avenue. Now, certain maps, sworn to by those who made them, have been put in evidence; and without burdening you particularly with going over the details, I may charge you that if you believe the testimony of the surveyor and of the officers who made those maps, and further believe that the natural and artificial monuments that they found on the soil when the maps were made coincided in location with the monuments, artificial or natural, that were placed on the soil when the deed was given, and when the act of cession was passed, you are warranted in finding that the fence on the line of Hamilton avenue is substantially coincident with the property line and the line of jurisdiction of the United States there. And inasmuch as it is undisputed that the fatal blow was struck at a point certainly 100 feet inside of that fence, I charge you that if you believe the testimony of this surveyor and of the officers, you are warranted in finding that the fatal blow was struck on property within the exclusive jurisdiction of the United States.

Having got as far as that, the next question for you to take up and determine is this: Was this homicide excusable? Now, there are varieties of excusable homicide. For instance, homicide by misadventure,—that is by pure accident, without negligence,—is excusable. But the only kind of excusable homicide that there is any pretense of here, or that you need in any way concern yourselves with, is what is known as "homicide in self-defense." Under the law a person has the right to resist the application of force to himself with force proportioned to the attack. It used to be said that the offense threatened must be a felony in order to justify the taking of life in resisting. That is a very unsatisfactory rule for jurymen, because the distinction between felony and

misdemeanor is frequently regulated by statute; it varies in the different states, and is not one within the general knowledge of most laymen. Therefore I instruct you that the rule to be followed is this, which you will find more convenient for your deliberation: If an assailant comes against me with a deadly weapon, apparently meaning to use it, or if without such weapon he assails me, breathing forth threatenings and slaughter, or by any other means indicating that it is his intention to inflict upon me a beating of such a character as to imperil life, or to maim me, or do me grievous bodily harm, then I may take life, when necessary to repel the assault. That is the general rule, and I have no doubt that it commends itself to your good sense. But, like all rules, it must be studied with its qualifications; and the first qualification to which I desire to call your attention is this: It is my duty when attacked to retreat as far as the fierceness of the assault would permit. It used to be said that it was the duty of the assailed to retreat to the ditch or to the wall. That picturesque expression was coined before the days of fire-arms, when every man who walked the streets of London walked with his weapons by his side,—his rapier or his dagger, his quarter-staff or single-stick. It is not adapted for our use now; and even when it was coined it was ill-adapted to its purpose, for a man might be assailed at a place where there was neither ditch nor wall within three miles. The rule laid down by later authorities and sanctioned by text writers of ability is this: It is the duty of the assailed to abstain from the infliction of death until he has retreated as far as he can with safety to himself. Here let me call your attention to a very apt illustration which is used, —whether in a reported case or whether as the expression of a text writer I am not certain, but it is a convenient illustration to have before you. Manslaughter and excusable homicide, as you will see later on, approach each other very nearly, and the distinction between them is thus indicated: "In excusable homicide the slayer could not escape if he would; in manslaughter he would not escape if he could." That illustration very happily, in a few words, points out the distinction between the exercise of the right of excusable homicide and the crime of manslaughter, to which we will recur later on. There is another qualification, however, of the rule: The danger apprehended from the assailant need not be actually imminent, and irremediable,—it need only be apparently so. The learned district attorney called your attention to a case which very forcibly illustrates that qualification, where a person seeking to terrify pointed an unloaded gun at another, and that other person, deeming from the appearances that his life was in danger, replied by a discharge from his own pistol, and took the assailant's life. It is in 2 N. Y.[1] I think; and the court said he was entitled to rely upon the appearances. Now that same word "apparently" has given courts and text writers no end of trouble. Apparently to whom? Suppose one of you gentlemen was a man of a quick eye and powerful build, muscles of iron, and nerves of steel, feeling himself competent to meet and throw with his

[1] Shorter v. People, 2 N. Y. 193, 197.

naked hand any man that he has yet encountered who came against him with nothing but a knife,—is the test of apparently imminent peril to be applied as he in his individual case, if he were the assailed, would apply it? Or is it to be applied as perhaps another jury-man would apply it,—weak, under-sized, nervous from disease, inexperienced in personal combats? You see that it is a difficult question to deal with in the abstract. But in the concrete,—that is, in applying it to cases as they arise,—you will probably not experience as much difficulty as courts and text writers do in explaining it. These tests are to be applied: This belief—the belief that the assailed person has—must be an honest and sincere belief. That is one element. Secondly, it must not be negligently formed, or, as otherwise expressed, it must be founded upon reasonable grounds. And in determining whether it is founded on reasonable grounds, the jury are not to conceive of some ideally reasonable person, but they are to put themselves in the position of the assailed person, with his physical and mental equipment, surrounded with the circumstances and exposed to the influences with which he was surrounded, and to which he was exposed at the time. If, with these tests applied,—that the belief is honest and sincere; that it is not negligently formed, but is reasonably grounded,—if with those elements duly considered, the jury are satisfied that there was then an apparently imminent danger of death or grievous bodily harm to the person assailed, he is entitled to act upon the appearances. And the same rule as to appearances must be applied to the first qualification of the rule of self-defense,—that is, as to the time, if at all, when he should begin to retreat, and as to the limit to which his retreat should be conducted. In determining that question, also, you are to put yourselves in the place of the person assailed, surrounded by the circumstances, and exposed to the influences to which he was exposed. Thus much as to an attack upon one's self. Now as to an attack upon another. An attack made upon a friend, when it is of so fierce a character as has been described, may be resisted in a similar way; and there are similar qualifications of that rule. To state it in other words, there must be an apparently imminent fatal assault, or one calculated to work grievous harm, to justify the intervenor in taking the assailant's life. There must be a *bona fide* belief by the defendant,—with the qualifications as to appearances that I have called your attention to,—a *bona fide* belief by the defendant that an atrocious or felonious assault is in process of commission, which can only be resisted by the death of the felonious assailant, to make the killing excusable homicide; but if such belief though *bana fide* be negligently adopted by the defendant, it would be *manslaughter*.

Should you reach the conclusion that the homicide was not excusable, the next question for you to determine is: Was it manslaughter? Manslaughter, as you will remember, was defined by the statute, and was the unlawfully and willfully, but without malice, killing a person. It has also been thus defined at common law: "Manslaughter arises from the sudden heat of the passions; murder, from the wickedness of the heart." "Voluntary manslaughter is an intentional killing in hot blood,

and differs from murder in this: that though the act which occasions the death be unlawful, or likely to be attended with bodily mischief, yet the malice aforethought, which is the essence of murder, is presumed to be wanting; and, the act being imputed to the infirmity of human nature, the punishment is proportionately lenient." "The provocation in the case of a killing in hot blood must be such as to account for the act by reason of the infirmity of human passions in men in general, and without attributing to the prisoner a cruel and relentless disposition." It includes the killing in hot blood; it also includes negligent killing. It will be more convenient for you, when you reach this stage of the case, to pass over for the moment the consideration of the question whether this crime—if crime it be—is manslaughter, and, if you reach the conclusion that it was not excusable homicide, determine at once whether or not it was murder; because, if not excusable homicide and not murder, then, the killing being admitted, it must be manslaughter. Manslaughter occupies the middle ground between excusable homicide on the one hand and murder on the other.

Murder, you will remember, is not defined by the statute, and, to paraphase the common-law definition which I read, it is an unlawful killing, with malice. Malice, you will remember, I told you was the intention to do bodily harm; a formed design to do mischief. It has also been defined as a deliberate intent to kill. It does not necessarily import any especial malevolence towards the individual slain, but also includes the case of a generally depraved, wicked, and malicious spirit, a heart regardless of social duty, and deliberately bent on mischief. It imports premeditation. Therefore there must logically be a period of prior consideration; but as to the duration of that period no limit can be arbitrarily assigned. The time will vary as the minds and temperaments of men, and as do the circumstances in which they are placed. The human mind acts at times with marvelous rapidity. Men have sometimes seen the events of a life-time pass in a few minutes before their mental vision.[1] Thought is sometimes referred to as the very

---

[1] Rear-Admiral Sir Francis Beaufort was once nearly drowned. During the brief period of apparent unconsciousness after he sank for the third time, his mind reviewed every event of his past life. His account of his experience, quoted in Miss Martineau's Biographical Sketches, is very interesting. "The course of those thoughts," he says, "I can even now in a great measure retrace. The event which had just taken place; the awkwardness which produced it; the bustle it must have occasioned; the effect it would have on a most affectionate father; the manner in which he would disclose it to the rest of the family; and a thousand other circumstances minutely associated with home,—were the first series of reflections that occurred. They took then a wider range: our last cruise; a former voyage and shipwreck; my school, the progress I had made there, and the time I had misspent; and even all my boyish pursuits and adventures. Thus traveling backward, every past incident of my life seemed to glance across my recollection in retrograde succession; not, however, in mere outline, as here stated, but the picture filled up with every minute and collateral feature. In short, the whole period of my existence seemed to be placed before me in a kind of panoramic review, and each act of it seemed to be accompanied by a consciousness of right or wrong, or by some reflection on its cause or its consequences. Indeed, many trifling events, which had been long forgotten, then crowded into my imagination, and with the character of recent familiarity." If this mental action continued until he was fully restored to consciousness, the time consumed was about 20 minutes. Admiral Beaufort, however, was always convinced that it lasted only during submersion; if so, all these events swept before his mental vision in the space of two minutes.

symbol of swiftness.[1]   There is no time so short but that within it the human mind can form a deliberate purpose to do an act; and if the intent to do mischief to another is thus formed as a deliberate intent, though after no matter how short a period of reflection, it none the less is malice.   Malice, in the old definitions, is spoken of as express or implied.   That again is a distinction which is a delusion and a snare. Practically, jurymen never deal with express malice.   There is no express evidence of malice given to them.   Malice, as I have told you, is an intent of the mind and heart.   There is never presented to a jury direct evidence of what was the intent of the man's heart at the time.   He is the only possible direct witness to that; and if he meant so to testify, he would plead guilty.   The existence or non-existence of malice is an inference to be drawn by the jury from all the facts in the case.   The emotions of the heart, the processes of the mind, are to us, or to any one outside of the individual, exhibited by the acts which the individual performs; and we are entitled to infer what his intent was,—what were the processes of his mind, and the feelings of his heart,—by a careful study of the acts which he performed, and of the other external indications which he may have given of what his state of mind and heart was. As an eminent text writer has put it, there is no case of malicious homicide in which malice is not inferred from attendant circumstances; no case in which it is demonstrated as express.   We have no power to ascertain the certain condition of a man's heart; the best we can do is to infer his intent more or less satisfactorily, from his acts.   Now, a person is presumed to intend what he does.   A man who performs an act which he knows will produce a particular result is, from our common experience, presumed to have anticipated that result, and to have intended it. Therefore we have a right to say, and the law says, that when a homicide is committed by weapons indicating design, then it is not necessary to prove that such design existed at any definite period before the fatal blow.   From the very fact of a blow being struck we have the right to infer as a presumption of fact, but not of law, (a distinction I will call your attention to in a moment,) that the blow was intended prior to the striking, although at a period of time inappreciably distant.   And thus we frequently find the statement laid down in reported cases and by text writers, that malice is to be inferred from the use of a deadly weapon. Put thus baldly, the statement of the proposition is hardly fair to the defendant.   It is true, if that is all the evidence in the case.   Proven the death, proven the slaying with a deadly weapon, and stopping there, we are warranted in inferring malice, and therefore finding the crime to be murder.   But it is very, very rarely that that is all the evidence in the case.   Your own experience, from what you have heard and what you have read, certainly must have instructed you that there is hardly ever, if, indeed, ever,—I never heard of one,—a case where the only fact

[1] Haste me to know 't, that I, with wings as *swift*
As *meditation*, or the *thoughts* of love,
May sweep to my revenge.
                                        *Hamlet:   Act I., Scene 5*

proved against the defendant, or the only fact proved in his favor, was the killing the deceased with a deadly weapon. And the moment a single other fact is admitted into the case, this statement of a presumption becomes misleading, unless the jury bear in mind the caution which I will now give. Malice is to be inferred from *all* the facts in the case. If malice is found, it must be drawn as an inference from everything that is proved taken together and considered as a whole. Every fact, no matter how small; every circumstance, no matter how trivial, which bears upon the question of malice, must be considered by the jury at the same time that they consider the use of the deadly weapon; and it is only as a conclusion from all those facts and circumstances that malice, if inferred at all, is to be inferred. To murder, the existence of malice is absolutely essential. If there is no malice, and if the homicide is not excusable, then it must be manslaughter.

There have been many requests submitted by the prisoner's counsel bearing on the subject of this being a military post, and of the rules governing the service, the articles of war, etc. Now, that need not concern you a particle. This is not a slaying in the discharge of any military duty; it is not the case of the shooting down a prisoner escaping from the guard-house; it is not the case of shooting down an intruder seeking to elude a sentry, or attempting to run his guard. There is no element of the discharge of a military duty about this case at all. Waiving entirely any evidence as to a direct or implied permission for citizens to cross that parade ground, waiving that altogether, and considering that Willis stood there a naked trespasser, intruding wholly without right in a place where he had no business to be, that fact did not warrant a private soldier without any orders from his superior officer in shooting him down in his tracks. Nay, if Willis stood there a red-handed murderer, striding triumphant over the plain, with his victim behind him, but with his crime accomplished, that fact did not justify the killing of him on sight. It might be an excuse for hot blood in the man who thus saw the corpse of his soldier friend on the ground; but it was no excuse for shooting down the slayer. On the other hand, if slaying in self-defense were warranted in this case, it would stand the prisoner in just as good stead if he had slain Willis on Hamilton avenue as within the precincts of the reservation. There is no element whatever of military duty that enters into the determination of this case, and you need not concern yourselves with it.

There are other minor branches of the case to which it is proper that I should call your attention. The first is intoxication. There is no direct evidence of intoxication on the part of the prisoner in this case. There is, however, evidence of his having drunk several times; and I know not, of course, to what your deliberations may or may not lead you in that regard; and it is therefore proper that I should give you instructions as to the bearing of intoxication, if found to exist in the case of the defendant. Intoxication is no excuse for crime. A man cannot commit a crime and then say, "I was intoxicated," and claim to go unwhipped of his offense. It is no excuse whatever for the commission of crime. But when shown,

it may do one of two things: it may sometimes bring murder down to the grade of manslaughter, and it may sometimes bring apparent self-defense up to the grade of manslaughter. The court of appeals in this state has thus laid down the rule:

"It has never yet been held that the crime of murder can be reduced to manslaughter by showing that the perpetrator was drunk, when the same offense, if committed by a sober man would be murder. But if by reason of intoxication the defendant was so far deprived of his senses as to be incapable of entertaining a purpose, or of acting from design, then he might not be guilty of murder, but be guilty of manslaughter."

And the same rule is thus stated by a very eminent text writer:

"Where the question of a specific intent is essential to the commission of a crime [and I have already charged you that malice, which is intent, is necessary to the crime of murder] the fact that an offender was drunk when he did the act which, being coupled with that intention, would constitute the crime, should be taken into account by the jury in deciding whether he had that intention."

But it is needless for me to call your attention to the fact that courts have repeatedly held that this excuse is to be received with great caution. The question on that branch of the case which is always left for the jury to determine is whether the defendant's mental condition was such that he was capable of a specific intent to take life.

I also told you that intoxication would sometimes bring self-defense up to the grade of manslaughter. You remember what I told you about appearances being looked at from the standpoint of the person assailed, your putting yourself in his place, and looking at it with his surroundings,—the circumstances as they surrounded him. Now, if the danger seemed apparently imminent to him as he was, but seemed so apparent to him only because his mind was confused with liquor,—wouldn't have been thus apparent to him, or wouldn't have seemed to be so imminent if his mind had been clear,—in other words, if he made an error of fact in determining whether or not his peril was imminent, and that error of fact was due to the circumstance that he was under the influence of liquor, then, as drunkenness is negligence, he was negligent in forming his belief. He would then be guilty of negligent homicide; and negligent homicide is manslaughter.

The presumption of innocence. Upon that I surely need say nothing to you. It is the A, B, C, of common life, as it is of law. The law presumes a man to be innocent, until he is proved guilty. That presumption stands by him through the trial to its close, until it is overcome by affirmative proof. And if the evidence of guilt or innocence be so evenly balanced as to cause the jury to entertain a reasonable doubt as to his guilt or innocence, the accused should be acquitted. That leads me to the definition of reasonable doubt. What is reasonable doubt? Reasonable doubt is a question of common sense and reason, and cannot be ascertained by artificial rule or definition. Moral evidence cannot be weighed with the nicety and certainty with which coin and bullion are weighed at the mint. I can do no better on this branch of the case than

to read you from a decision of the supreme court of the United States, where the following charge was approved as being sound law:

"The court charges you that the law presumes the defendant innocent, until proven guilty beyond a reasonable doubt; that if you can reconcile the evidence before you upon any reasonable hypothesis consistent with the defendant's innocence you should do so, and in that case find him not guilty. You are further instructed that you cannot find the defendant guilty, unless from all the evidence you believe him guilty beyond a reasonable doubt. The court further charges you that a reasonable doubt is a doubt based on reason, and which is reasonable in view of all the evidence; and if, after an impartial comparison and consideration of all the evidence, you can candidly say that you are not satisfied of the defendant's guilt, you have a reasonable doubt. But if, after such impartial comparison and consideration of all the evidence, you can truthfully say that you have an abiding conviction of the defendant's guilt, such as you would be willing to act upon in the more weighty and important matters relating to your own affairs, you have no reasonable doubt."

There are two other minor matters that I will now refer to. I admitted evidence (and probably strained the law somewhat in admitting it) as to the statements made by the prisoner on his way to the guard-house, or after arriving. There is a principle in the law of evidence which is known as "*res gestæ;*" that is, that the declarations of an individual made at the moment of a particular occurrence, when the circumstances are such that we may assume that his mind is controlled by the event, may be received in evidence, because they are supposed to be expressions involuntarily forced out of him by the particular event, and thus have an element of truthfulness which they might otherwise not have. That rule is very carefully guarded by the courts. And I only admitted the testimony here because, now that the defendant himself can take the stand, there does not seem to be the necessity of enforcing the rule so strictly, if the jury are properly charged upon it. Now, any statement or declaration that is put in evidence of course must be taken in its entirety; you must consider it as a whole. But you are not to give any more weight to a declaration thus made, or any weight at all, unless you are satisfied that it was made at a time when it was forced out as the utterance of a truth; forced out against his will, or without his will, by the particular event itself, and at a period of time so closely connected with the transaction that there has been no opportunity for subsequent reflection or determination as to what it might or might not be wise for him to say. With that qualification, I think the testimony can be left safely with you, and that there has been no error in admitting it.

There is one other point—a minor point—to which I would also call your attention. I am particularly anxious to do so because it is a piece of evidence of the defendant himself. And inasmuch as it came out in response to a question by the court, I should be loath to think that you might perhaps attach more importance to it than it deserves, and also 'extremely loath to think that any evidence called out by my question might work improperly to the disadvantage of the prisoner. You remember I asked him whether he had a pass that night, and he said he had not; and it was in evidence that the soldiers frequently left there and

came back without the formality of having a pass. Any evidence in that regard you remember. Now, you and I may have our own opinion as laymen, as civilians, upon the question whether it was or not, in the comprehensive language of the sixty-second article of war, "to the prejudice of good order and military discipline," to maintain a company of enlisted men in barracks, located only a few hundred feet from a row of rum-shops, without a guard or sentry to overlook their outgoings and incomings, so that they might leave their barracks at any hour of the night, and come back at any hour of the night, and possibly at any stage of intoxication that pleased them, without encountering any guard, or sentry, or superior officer. But whatever our opinions may be as to the wisdom of such a course, the prisoner is in no way responsible for that condition of affairs; and any feeling which we may have in consequence of its existence is in no way to be visited upon him. He was entitled to avail himself of and to enjoy just as much laxity of discipline as his superior officers at that post winked at; and whether he was out on pass, or without pass, must not weigh with you one feather's weight in handling this case, and in considering the facts. He is in no way responsible for anything of the kind, and no prejudice arises from the circumstances which are in evidence, as to the situation of this post and garrison, and the way in which it was conducted; they are not to influence you one particle.

---

After ruling upon the written requests to charge as presented by counsel, the court said:

Briefly to recapitulate: To murder, malice is essential. Malice is an intent to kill,—a formed design to kill. It imports premeditation; but the mental processes are so swift that premeditation may be found to exist within the very shortest time. Manslaughter is an unlawful killing without malice. It includes a killing in hot blood, after provocation. It includes a killing when a party, judging from appearances, makes an error of fact, and is mistaken because he is negligent. And it includes a killing which would otherwise be murder, unless you find that the mind is so obscured by intoxication as to be incapable of forming any purpose at all.

*Excusable homicide* is homicide in self-defense, against an attack such as I have explained to you, qualified with the duty of abstention from slaying until necessity compels the fatal act, and with the duty of retreating as far as safety to the assailed person will admit; and with the further qualification that appearances are enough, provided you find that the belief in them was sincere and honest,—that it was not formed negligently, but upon reasonable grounds, viewing the circumstances, and the facts and phenomena, by putting yourself for the moment in the place of the assailed; and finally forming your opinion upon the whole case from a consideration of all the facts.

Your verdict will be, and can only be, one of three. If you find the defendant guilty of murder, your verdict will be simply "Guilty;" if you

find him not guilty of murder, but guilty of manslaughter, your verdict will be, as stated, "Not guilty of murder, but guilty of manslaughter;" if you find that the homicide was excusable, as being in self-defense, which is the only excuse proffered here, then your verdict will be, of course, "Not guilty."

The verdict was "Not guilty."