## MARTIN v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. January 18, 1922.)

No. 76.

**I. Criminal law ⊙══13—Conviction proper under statute not defining.**

A conviction may be had for extortion under Criminal Code, § 85 (Comp. St. § 10253), though such statute does not define the term, notwithstanding sections 332, 333, 340 (Comp. St. §§ 10506, 10507, 10514).

**2. Extortion ⊙══4—Special agent of Department of Justice held guilty of extortion.**

A special agent of the Department of Justice, who falsely informed one who applied for a visa on a passport to permit an alien to visit the United States, that to get the matter attended to promptly a man must be sent to Washington and that the expenses incidental thereto would be $300, and required the applicant to pay the $300 after the application had been granted at Washington, was guilty of extortion under Criminal Code, § 85 (Comp. St. § 10253).

**3. Bribery ⊙══1(1)—Criminal law ⊙══37—Offense of accepting bribe complete when person asks for money; defense of entrapment held without merit.**

The offense of accepting a bribe, under Criminal Code, § 117 (Comp. St. § 10287), consists in asking for the money, and one prosecuted therefore cannot insist that government agents laid a trap, where the latter did nothing until the crime or arrangements were completed, and then only for the purpose and with the result of verifying the report of the person called on to pay the bribe.

In Error to the District Court of the United States for the Southern District of New York.

Eugene P. Martin was convicted of accepting bribes and extortion, and brings error. Affirmed.

The indictment contained seven counts. The first six charged that defendant accepted bribes as a special agent of the Department of Justice in violation of section 117 of the Criminal Code (Comp. St. § 10287). The seventh count charged extortion under section 85 (Comp. St. § 10253). Defendant was acquitted upon the first five counts and convicted on the sixth and seventh counts.

Defendant was a special agent of the Department of Justice, attached to the Bureau of Investigation in New York City. One Daus, a German subject, applied to the State Department for a visa upon his passport in order to permit him to visit the United States. He named, as a reference, one Leo Levy, a retired stockbroker and an American citizen. The State Department, in accordance with its routine, referred the Daus application to the Department of Justice for examination of the persons named as references, and, in due course, the duty was assigned to defendant. Levy was formally requested by defendant to call at the bureau for examination and he did call on defendant on November 16, 1920. Levy explained that he wished to aid Daus, who was his brother-in-law, to pass through the United States on his way from Cuba to Germany, as Daus was a sick man, and wished to avoid a three-weeks crossing in a small vessel from Cuba. Levy told defendant that, "if there were any incidental expenses connected with expediting the matter," he would not object to paying them.

After asking Levy some formal questions, defendant told him to obtain two affidavits from reputable merchants as to the character of Daus and to return later in the day. This Levy did. After defendant had read the affida-

vits, he said, according to Levy: "There are two ways of doing this thing. One is the regular way, which * * * may take weeks, and which may take months. Then again there is another way, according to which matters can be considerably expedited. But that * * * will cost you money. * * * You know those fellows down in Washington want to be greased. * * * They are not down there for their health." Martin said it would cost $300, and when Levy demurred, saying he did not like to pay $300, unless he felt "sure there is going to be a favorable result," defendant answered: "All you will have to agree to * * * will be to pay for the preliminary expenses, the incidental expenses, in connection with sending a man down to Washington," and the amount named was $30, to the payment of which Levy agreed, and thereupon defendant said: "All right; * * * you will hear from me further."

Defendant did not transmit the affidavits through the Washington office, as was his duty. Instead, he retained them from November 16th to November 23d, and on the latter date wrote to Metcalf, an employee of the Department of Justice at Washington, inclosing the affidavits and stating: "I promised to forward these affidavits with the idea in view that, if the State Department * * * are shown these affidavits, no doubt it will expedite the matter, and therefore take the liberty of asking you, at your earliest convenience, to take up this matter at your earliest convenience." No copy of the letter was made for the files of the local bureau, nor any record made thereof. Metcalf (the propriety of whose conduct is not questioned) and defendant had been acquainted for some years, first having met in official relationship. Metcalf's duties were not, in any way, concerned with visa references. Metcalf carried out defendant's request, and delivered the letter and affidavits to an employee of the Department of State at Washington, and the letter thus became part of the official file of that department.

Having learned from Metcalf that the application had been granted, defendant, on November 24th, informed Levy by telephone accordingly. At that time, defendant's official duties in this connection were ended. On cross-examination, it developed that on November 16th, after Levy's conversation with defendant, he communicated the substance of the conversation to an employee of the Department of Justice, whom he happened to know. Thus it was that on November 26th Levy telephoned from an office of the Department of Justice in New York to defendant at the latter's home, and a stenographer in the Department of Justice took down the conversation, at the end of which Levy said that he was willing "to go through with it," and defendant said, "That is all right."

On December 1st, defendant called at Levy's office and collected the $30 for the pretended expenses of sending a man to Washington. At the same time defendant showed Levy a letter written by an employee of the State Department to Metcalf, stating that the application had been granted. Metcalf mailed that letter to defendant, pursuant to a telephone request made by defendant, when he called Metcalf at Washington, and inquired whether the latter had heard anything in regard to the application. On December 7th Levy called upon the defendant, pursuant to the latter's suggestion. Levy was then acting with the knowledge of Lamb, Division Superintendent of the Department of Justice, and defendant's superior. Levy handed defendant $270 in currency, contained in an envelope. Defendant drew from his pocket a long envelope, addressed and bearing postage. He placed the envelope, containing the money given by Levy, in the larger envelope, sealed that envelope, and placed it in his pocket. The envelope was obtained from one Newman, a special agent, and defendant admitted he had given the envelope to Newman to mail. It was addressed to Frederick L. Kramer, 120 Broadway, and on the back bore the writing, "E. P. M., 197 Highland Place, Brooklyn, N. Y."

The defendant resided in New Rochelle. His sister resided at the return address written on the back of the envelope addressed to Kramer. Kramer, an attorney, was an old friend of defendant, and had permitted him to use his office on previous occasions as a mailing address. Defendant did not testify, although a statement made by him to Lamb, after he had attempted to mail the $270, was introduced as part of the prosecution's case.

Slade & Slade, of New York City (David H. Slade, of New York City, of counsel), for plaintiff in error.

William Hayward, U. S. Atty., and John E. Joyce, Asst. U. S. Atty., both of New York City.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). [1] 1. It is contended that the seventh count fails to charge a crime, because the statute fails to define extortion. Section 85 of the Criminal Code reads as follows:

"Every officer, clerk, agent, or employee of the United States, and every person representing himself to be or assuming to act as such officer, clerk, agent, or employee, who, under color of his office, clerkship, agency, or employment or under color of his pretended or assumed office, clerkship, agency, or employment, is guilty of extortion, and every person who shall attempt any act which if performed would make him guilty of extortion, shall be fined not more than five hundred dollars, or imprisoned not more than one year, or both."

Attention is called by defendant to sections 332 and 333 of the Criminal Code (Comp. St. §§ 10506, 10507), where the expression "an offense defined in any law of the United States" is used, and to section 340 (Comp. St. § 10514), which provides: "The crimes and offenses defined in this title shall be cognizable in the Circuit and District Courts, * * *" as prescribed in R. S. §§ 563, and 629 (Comp. St. § 991). Briefly stated, the argument is, first, that in any event the statute must define the crime of extortion; and, secondly, that under section 340, supra, the crime is not cognizable in the national courts, because not defined "in this title."

An examination of the Criminal Code and of the Revised Statutes will show that, in a considerable number of instances, crimes denounced have not been defined. Some of these statutes, in substantially their present form, have been on the books for over or nearly a century. Thus R. S. § 5286 (Comp. St. § 10177), as to military expeditions against people at peace with the United States, had its origin in a statute of 1794; section 5368 (Comp. St. § 10463), as to piracy, in a statute at least as early as 1819; and the statute here under consideration (section 85), as to extortion, in a statute at least as early as 1825. "Steal," for instance, is not defined in Criminal Code, §§ 36 and 47 (Comp. St. §§ 10200, 10214); nor "forge" in sections 27 and 30 (Comp. St. §§ 10191, 10194); nor "rob," in section 46 (Comp. St. § 10213); and the illustrations could be multiplied.

Thus, by a long history of practical construction by the Legislature and by the decisions of the courts, resort is had either to the common-law definitions of offenses of an ancient character or to the ordinary meaning of words or to both. Two noteworthy cases, each well worth reading and highly instructive, have settled the principle.

In United States v. Smith, 18 U. S. (5 Wheat.) 153, 5 L. Ed. 57, it appears that Smith was indicted for piracy committed in violation of the Act of March 3, 1819, § 5, 3 Stat. 513. That act provided "that if any person * * * shall, on the high seas, commit the crime of piracy, as defined by the law of nations, * * *" he should be

punished with death. The case was argued by Wirt for the United States and Webster for defendant, and Mr. Justice Story delivered the opinion of the court. "The argument," said Mr. Justice Story, "is that Congress is bound to define, in terms, the offense of piracy, and is not at liberty to leave it to be ascertained by judicial interpretation. * * *." After disposing of this argument, Mr. Justice Story continued:

"But supposing Congress were bound, in all the cases included in the clause under consideration to define the offense, still there is nothing which restricts it to a mere logical enumeration in detail, of all the facts constituting the offense. Congress may as well define, by using a term of a known and determinate meaning, as by an express enumeration of all the particulars included in that term. That is certain which is, by necessary reference, made certain. When the act of 1790 declares that any person who shall commit the crime of robbery or murder on the high seas shall be deemed a pirate, the crime is not less clearly ascertained than it would be by using the definitions of these terms as they are found in our treatises of the common law. In fact, by such a reference, the definitions are necessarily included, as much as if they stood in the text of the act. In respect to murder, where 'malice aforethought' is of the essence of the offense, even if the common-law definition were quoted in express terms, we should still be driven to deny that the definition was perfect, since the meaning of 'malice aforethought' would remain to be gathered from the common law. There would then be no end to our difficulties, or our definitions, for each would involve some terms which might still require some new explanation."

Considering next whether the crime of piracy was defined by the law of nations with reasonable certainty, Mr. Justice Story observed:

"What the law of nations on this subject is may be ascertained by consulting the works of jurists, writing professedly on public laws, or by the general usages and practice of nations, or by judicial decisions recognizing and enforcing that law. There is scarcely a writer on the law of nations who does not allude to piracy as a crime of a settled and determinate nature, and, whatever may be the diversity of definitions in other respects, all writers concur in holding that robbery, or forcible depredations upon the sea, animo furandi, is piracy. The same doctrine is held by all the great writers on maritime law, in terms that admit of no reasonable doubt. The common law, too, recognizes and punishes piracy as an offense, not against its own municipal code, but as an offense against the law of nations (which is part of the common law), as an offense against the universal law of society, a pirate being deemed an enemy of the human race."

After an exhaustive review of the authorities, it was concluded:

"So that, whether we advert to writers on the common law or the maritime law, or the law of nations, we shall find that they universally treat of piracy as an offense against the law of nations, and that its true definition by that law is robbery upon the sea."

These quotations are extracted solely for convenience, although the opinion should be entirely read to appreciate its full value.

In Wiborg v. United States, 163 U. S. 632, 16 Sup. Ct. 1127, 1197, 41 L. Ed. 289, defendant, with others, was indicted for setting on foot a military expedition and enterprise against Cuba. The court was called upon, inter alia, to ascertain the meaning of "military expedition or enterprise," as used in R. S. § 5286, forbidding "any military expedition or enterprise" against any state or people at peace with the United States. Mr. Chief Justice Fuller said:

"The first and the main question in the present case is whether the trial judge erred in his instructions to the jury in respect of what constitutes a 'military expedition or enterprise' under the statute. The question is one of municipal law, and the writers on international law afford no controlling aid in its solution."

The court then examined the definitions of lexicographers and laid down its definition.

Section 273 of the Criminal Code (Comp. St. § 10446) defines the crime of murder, but its predecessor, R. S. § 5339, did not. Lacombe, J., in charging a jury where defendant had been indicted under R. S. § 5339, said:

"But the statutes do not define the offense of murder. Therefore we must turn to the common law, as it was in England before the Revolution, and has been interpreted since by our courts, for a definition of that crime." United States v. King (C. C.) 34 Fed. 302, 306.

To the same effect, Maxey, J., charged the jury in United States v. Lewis (C. C.) 111 Fed. 630, 632.

[2] Apparently, the first case under the statute as to extortion, of which there is a report, is United States v. Waitz (1876) 28 Fed. Cas. 386, No. 16,631. There, Hillyer, J., defined extortion, when charging a jury, as did Dick, J., in United States v. Deaver (D. C., 1882) 14 Fed. 595. Judge Thomson in the case at bar instructed the jury in an admirably clear and comprehensive charge. He defined extortion as follows:

"Extortion is the unlawful taking by any officer under color of his office of any money or thing of value that is not due him, or more than is due, or before it is due."

He thus adopted the classic definition of Blackstone. 4 Blackstone, Com. 141; also 1 Hawkins, P. C. 418; 25 C. J. 233. With this definition in mind, if the jury believed the witnesses for the prosecution, the crime of extortion, under section 85, was committed by defendant.

[3] 2. It is contended that defendant was induced to commit the crime charged, and that the government agents laid a trap for him. On the evidence, it appeared that the crime or arrangements were completed on November 16th, and that everything occurring thereafter was done properly and lawfully for the purpose and with the result of verifying Levy's report to the Department of Justice as to the transactions of November 16th. Grimm v. United States, 156 U. S. 604, 610, 15 Sup. Ct. 470, 39 L. Ed. 550; United States v. Wight (D. C.) 38 Fed. 106, 111.

Under Criminal Code, § 117, the crime, inter alia, consists in asking for money or in promising to pay money with intent, etc. As the evidence shows, defendant asked for the money on November 16th, and in any event then agreed to pay the $30. Everything done thereafter was merely in furtherance of a crime which had been completed on November 16th.

We have examined into the other assignments of error, but they do not present any questions calling for discussion.

Judgment affirmed.