THE STATE v. FLEETWOOD GORDON, Appellant.

Division Two, November 21, 1905.

1. ASSAULT: Opprobious Epithets: No Justification. Mere words of reproach or opprobrious epithets applied to a party are not sufficient provocation to justify an assault upon the person using them, or to free a party killing from the guilt of murder.

2. SELF-DEFENSE: Voluntarily Entering Into Difficulty: Resisting Assault: Evidence: Erroneous Instruction. Deceased declared, in his dying declaration, that defendant applied opprobrious epithets to him, and that thereupon he (deceased) struck defendant with his fist. The evidence showed that a fight ensued between the two, that deceased grabbed defendant with his left arm around his head, pressed defendant to his body, and began choking him, and that while in this position, defendant drew a knife from his pocket and stabbed the deceased, inflicting the wounds from which he died. Defendant testified that he stabbed deceased in order to liberate himself, and prevent the deceased from inflicting great bodily harm upon him. The evidence further showed that deceased was a large, athletic and powerful man, weighing from 165 to 175 pounds, and that defendant was physically small, and much under the average of strength and power. The court gave an instruction (set out in the statement) which, in effect, directed the jury that if defendant voluntarily entered into the difficulty, even though he had committed no assault or offered any personal violence to the deceased, but had only applied an insulting epithet or opprobrious language to the deceased, and the deceased, upon this provocation only, had assaulted him and the defendant had voluntarily resisted the assault thus made upon him, still he had no right of self-defense. Held, that this instruction was erroneous; that, since deceased was not justified in assaulting defendant because of the opprobrious epithets, therefore, defendant had the right to resist the assault, and it was not proper to ap-

ply to him the law applied to one who is wrong in the first instance; and that, considering the great disparity in weight and size, and the character of the assault, it should have been submitted to the jury whether defendant had not reasonable cause to apprehend that deceased was about to kill him or do him some great bodily harm.

3. ———: **Apprehending Danger: Reasonable Cause: Instruction.** In order to acquit, on the ground of self-defense, it is only necessary that the jury believe that the defendant had reasonable cause to apprehend, from the conduct of the deceased, that there was immediate danger of a design to commit a felony or to do great bodily harm to the defendant. And the court should not so modify instructions as to impress the jury with the idea that the danger to defendant must have been in fact real or actual.

4. **NEW TRIAL: Incompetency of Jurors.** Without determining whether, in this case, the court erred in refusing a new trial on the ground of the incompetency of jurors, it is held that it would require a flagrant abuse of the trial court's discretion to justify interference by the appellate court on that ground.

Appeal from Boone Circuit Court.—*Hon. Alex. H. Waller*, Judge.

Reversed and remanded.

*O. Guitar, S. Turner, J. L. Stephens, J. C. Gillespy, E. W. Hinton* and *W. M. Williams* for appellant.

(1) Manifest error was committed by the court in giving instruction 10, upon behalf of the State. This instruction is palpably erroneous, and absolutely deprived the defendant of his right of self-defense. State v. Gilmore, 95 Mo. 554; State v. Rapp, 142 Mo. 448. One does not lose his right of self-defense by beginning a quarrel unless he does so for the purpose of doing his adversary great bodily harm, or effecting his death. This instruction was incorrect in two particulars: first, it deprived the defendant of the right of self-defense, if he voluntarily defended himself, even though the deceased brought on the difficulty, and was the aggressor; and, second, it deprived the defendant of the right of self-defense, if he brought on the difficulty, without any

design to wreak his malice, or without any design to inflict bodily harm. This is not the law. If the defendant had no felonious intent, he was still clothed with the right of self-defense, even though he brought on the difficulty. State v. Garrett, 170 Mo. 397; State v. Higgerson, 157 Mo. 401; State v. Rapp, supra; State v. Gilmore, supra; State v. Patterson, 159 Mo. 562. (2) Even had instruction 10 been correct as an abstract proposition of law, still it would have been error to give it in this case, for the good and sufficient reason that there is no evidence upon which to base it. (3) The court further deprived defendant of the right of self-defense in the modification of instructions 1 and 2, asked by defendant, by the insertion of the words, "if necessary." It is not the law that the danger should have been real or actual, that is, necessary, in order to justify one in acting in self-defense. If the defendant had a reasonable cause to believe, and did believe, that it was necessary for him to do what he did, then he was entitled to an acquittal. (4) A new trial should have been granted because two of the jurors had formed and expressed an opinion adverse to defendant before they were summoned as jurors, and were prejudiced against him, and this fact was not disclosed on their *voir dire,* and was unknown to defendant. State v. Ross, 29 Mo. 51; State v. Burnside, 37 Mo. 343; State v. Wyatt, 50 Mo. 309.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for the State.

(1) Instruction 10 is supported by the following authorities: State v. Partlow, 90 Mo. 608; State v. Pennington, 146 Mo. 27; State v. Gamble, 119 Mo. 427; State v. Patterson, 159 Mo. 560; State v. Parker, 106 Mo. 217; State v. Davidson, 95 Mo. 155. (2) When the facts and circumstances of this case are considered, the conduct of the defendant in Doelling's place of busi-

ness, the time he went there, the language he used when requested to come later, the eagerness with which he entered the combat, the malignity with which he pursued, with open knife, his fleeing victim, there should be but little question as to the sufficiency of the evidence on which to submit the question of bringing on the difficulty or voluntarily entering into the same. (3) Instructions 1 and 2, as modified, declared the law of self-defense in a more favorable form than defendant was entitled to. (4) The court did not err in refusing to grant a new trial to defendant on the ground that two jurors had prejudged his case. State v. Ross, 74 Mo. 318; State v. Howell, 117 Mo. 342; State v. Cook, 84 Mo. 40.

GANTT, J.—On the 18th day of October, 1902, the grand jury of Boone county, Missouri, at the October term of the circuit court, returned an indictment against the defendant, charging him with murder in the first degree of Hugo G. Doelling on the 8th day of July, 1902. The defendant was duly arraigned upon said indictment and entered his plea of not guilty thereto. At the February term, 1904, the defendant was put upon his trial before a jury, and was convicted of manslaughter in the fourth degree, and his punishment assessed at imprisonment in the State penitentiary for a term of two years. Motions for new trial and in arrest of judgment were filed in due time, heard and overruled and exceptions saved, and from the judgment and sentence, the defendant appealed to this court.

The evidence on behalf of the State tended to prove the following facts:

On the 8th day of July, 1902, Hugo G. Doelling was the proprietor of and conducted a restaurant in the city of Columbia, Boone county, Missouri. He was living with his wife and child in rooms immediately above the restaurant, and had lived in the city about one year. The defendant was an attorney at law, residing and

practicing at said city. An account against Doelling amounting to about forty dollars had been placed in the hands of the defendant for collection. It appears that the deceased had been slow in the payment of this bill, and the defendant in the discharge of his duty to his client had visited Doelling several times prior to the 8th of July, 1902, to collect the same. On the 8th of July, defendant's client who owned the account had called at defendant's office during his absence and requested defendant's father to ask the defendant to call at his hotel at the noon hour to see him in regard to this ac-- count. When the defendant received this information, he took the account and started to the hotel; he went first to the restaurant of Doelling and went in to see Doelling about it. Several people were in the res- taurant at the time eating dinner; Doelling was busy in the dining room, and when the defendant entered the front room of the restaurant, Doelling came from the dining room to meet the defendant in the front room. It appears that Mrs. Doelling was near where they met. According to the dying declaration of the deceased, when the deceased approached the defendant, the de- fendant presented him the account and said, "What are you going to do about this bill?" and the deceased said "Wait, come in after dinner," and the defendant said, "You son-of-a-bitch, I won't do it, I will not wait," to which Doelling replied, "How dare you come into my house and call me such names?" To which defendant replied, "You son-of-a-bitch, I will kill you besides." At this point the deceased in his dying declaration says when he said this, "I struck him with my fist, and he then pulled his knife and cut me." Mrs. Doelling did not remember seeing her husband strike him, but says that immediately after the hot words passed between them they were in a scuffle before she realized any- thing. The conversation between the deceased and the defendant was in such low tones that none of the per- sons who were taking their dinner at the time observed

that any difficulty existed between the parties at all,
until their attention was directed by the scuffle between
the defendant and the deceased, and none of them tes-
tified as to who began the difficulty. After they had
scuffled a few seconds, Doelling put his hand on his
side and said, "He has stabbed me," and ran out of
the door crying "murder." Doelling then ran to the
corner of the block, and then out diagonally into the
middle of the street. As Doelling and the defendant
separated in the restaurant, the defendant was seen
holding a knife in his hand. Some of the witnesses
called it a dagger, some called it a "spring button"
knife, one witness said the blade was about five inches
long. As Doelling went up the street the defendant fol-
lowed and when Doelling went out into the middle of
the street the defendant continued straight ahead and
went to his room. The evidence on behalf of the de-
fendant tends to show that the deceased felt unkindly
towards him because he had insisted on his paying the
account. It was in evidence that the deceased upon one
occasion, speaking of the defendant, said, "If that G—d
—— red-headed Fleet. Gordon comes back here bother-
ing me about that thing any more, I will break his neck
and stamp him through the floor." The defendant tes-
tified that when he went into deceased's place of busi-
ness, the deceased approached him and in an angry
voice asked him what he wanted there, and that defend-
ant replied politely that he had come again to see about
the payment of that account, and the deceased requested
him to call later in the evening; that thereupon the de-
fendant told him that he had held this account for quite
awhile and had frequently been disappointed in the
promises of the deceased, and was tired fooling with
him, and that thereupon, without more, the deceased
struck him a heavy blow in the temple; that the blow
dazed and staggered the defendant, and thereupon the
deceased grabbed the defendant with his left arm
around his head, pressed the defendant to his body and

began choking him, and that while in this position, the defendant pulled his knife out of his pocket and cut the deceased in order to liberate himself and prevent the deceased from inflicting great bodily harm upon him. After going into the street Doelling was assisted upstairs to his rooms and the surgical examination revealed that he had received three stab wounds, one on the left shoulder, commencing at the spine and running toward the neck; a second one, about three inches from the spine between the ninth and tenth ribs, about an inch long; this second wound went straight in about two and a half inches, cutting the intercostal artery and penetrating the lung. The third wound was between the eighth and ninth ribs, about two and a half inches deep and cutting into the loop of the intestines. These wounds were fatal, and Doelling died that night about half past ten o'clock. The evidence also discloses that the deceased, Doelling, was a large, athletic and powerful man, weighing, according to the different judgments of the witnesses, from 165 to 175 pounds, and that the defendant Gordon is physically small, much under the average of strength and power.

The court instructed the jury on murder in the first degree and second degree and manslaughter in the fourth degree. For the State the court gave instruction number ten in the following words:

"If the jury believe and find from the evidence that the defendant had an altercation with Hugo G. Doelling, which resulted in the death of said Doelling, and that the defendant commenced such difficulty or voluntarily entered into the same with the felonious intent to take advantage of the quarrel thus begun and to kill said Doelling or to do him some great bodily harm, then there is no self-defense in this case, and the jury will not acquit the defendant on that ground. And this is true, no matter how violent defendant's passion became, or hard he was pressed, or how imminent his peril may have become during said difficulty. You are

further instructed, however, that although you may believe from the evidence and beyond a reasonable doubt that defendant had an altercation with Hugo G. Doelling, which resulted in the death of said Doelling, and that said defendant brought on or voluntarily entered into said difficulty, during the progress of which difficulty defendant intentionally stabbed and killed said Doelling, yet if you further find from the evidence that he did not bring on or enter into said difficulty with the view to take advantage of the quarrel thus begun and to slay said Doelling or to do him some great bodily harm, then the defendant cannot be justified on the ground of self-defense, and the killing was manslaughter in the fourth degree, and the jury will so find, no matter how hard pressed defendant was or imminent his peril may have become during said difficulty."

The court also modified instructions numbered one and two asked by the defendant by insertion of the words "if necessary," so as to make said instructions read as follows:

"1. If the jury believe from the evidence that at the time of the killing of the deceased Doelling, as charged in the indictment, the defendant Gordon went to the business house of said Doelling, in Columbia, to collect a claim theretofore placed in his hands as an attorney, for collection, and that then and there an angry controversy suddenly arose between said parties, followed by blows inflicted with his, Doelling's, fists on the head, face or body of said Gordon, and that said Doelling was a large, athletic and powerful man, and that Gordon was a physically small man, under the average of strength and power, and that he had then and there entertained a design to do him (Gordon) some great personal injury, with his fists, by reason of his (Doelling's) superior physical strength, and that there was then and there imminent danger of the accomplishment of such design, then the defendant Gordon was justified under the law in cutting or stabbing deceased and even

to kill him (deceased) if necessary to prevent the accomplishment of such design, even though the jury shall further believe from the evidence that said Doelling was unarmed at the time.

"2. If the defendant had any reasonable cause to believe from the words, acts and conduct of the deceased that he had a design to do him some great personal injury, and that such design was about to be accomplished, then defendant had a right to act on appearances and to cut or stab deceased (if necessary) to prevent the accomplishment of such design, and in this connection the jury are further instructed that defendant was not required to nicely gauge the force used, but that he could use any means that appeared reasonably necessary under the circumstances. Neither is it necessary to this defense that his danger should have been real or actual, or that it should have been impending and about to fall, but if he had reasonable cause to believe, and did believe these facts, and cut the deceased to prevent such expected harm, then you must acquit on the ground of self-defense."

The other instructions will be noted as far as necessary in the discussion of the case, together with the objections of the defendant to them.

I. One. of the principal contentions in this case, and one which requires consideration, is that the court erred in giving the tenth instruction on behalf of the State. This instruction is set forth in full in the statement which accompanies this opinion. No criticism is made on the first clause of this instruction, which told the jury that if the defendant brought on the difficulty with a felonious intent to kill the deceased, or to do him some great bodily harm, then the defendant could not be justified on the ground of self-defense, as a legal proposition, where the evidence warrants such an instruction, but it is earnestly insisted that the latter portion of the instruction in effect advised the jury that although the defendant voluntarily entered into the dif-

ficulty without any felonious intent and without any
purpose to do great bodily harm and after the same
had been brought on by the deceased, the jury were
bound to ignore any evidence tending to show self-de-
fense, and must at all events convict defendant of man-
slaughter. On the part of the State it is insisted that
this is a misconstruction of the instruction, that this
portion of the instruction was not attempting to deal
with the question of self-defense, but its purpose was to
declare the law as announced in State v. Partlow, 90
Mo. 608, in which the distinction was drawn between
the perfect and imperfect right of self-defense. In that
case this court accepted the doctrine announced in Reed
v. State, 11 Tex. App. 509, as follows:

"It may be divided into two general classes, to-
wit, perfect and imperfect right of self-defense. A per-
fect right of self-defense can only obtain and avail
where the party pleading it acted from necessity, and
was wholly free from wrong or blame in occasioning or
producing the necessity which required his action. If,
however, he was in the wrong—if he was himself violat-
ing or in the act of violating the law—and on account
of his own wrong was placed in a situation wherein it
became necessary for him to defend himself against an
attack made upon himself which was superinduced or
created by his own wrong, then the law justly limits his
right of self-defense, and regulates it according to the
magnitude of his own wrong. Such a state of case may
be said to illustrate and determine what in law would
be denominated the imperfect right of self-defense.
Whenever a party by his own wrongful act produces a
condition of things wherein it becomes necessary for
his own safety that he should take life or do serious
bodily harm, then indeed the law wisely imputes to him
his own wrong and its consequences to the extent that
they may and should be considered in determining the
grade of offense which but for such acts would never
have been occasioned. . . . How far and to what ex-

tent he will be excused or excusable in law must depend on the nature and character of the act he was committing, and which produced the necessity that he should defend himself.  When his own original act was in violation of law, then the law takes that fact into consideration in limiting his right of defense and resistance whilst in the  perpetration of such  unlawful act.  If he was engaged in the commission of a felony and, to prevent its commission, the party seeing it or about to be injured thereby makes a violent assault upon him, calculated to produce death or serious bodily harm, and in resisting such attack he slay his assailant, the law would impute the original wrong to the homicide and make it murder.  But if the original wrong was or would have been a misdemeanor, then the homicide growing out of or occasioned by it, though in self-defense from an assault made upon him, would be man-slaughter under the law.''

Bishop in the 2nd volume of Criminal Law (8 Ed.), section 701, states the rule in these words:  ''A common case is where two persons, upon a sudden quarrel, engage in mutual combat; then if either one, in the heat of it, kills the other, though with a deadly weapon, the offence is in most circumstances only manslaughter. When the combat  has become mutual, it  ordinarily ceases to be of importance by which party the first blow was given.  And, as we have seen, it makes no difference though the blow which proved fatal was, while prompted by the heat of the fight, inflicted with the intent to take life.'' Thus it will be observed that in Partlow's case this court held that the right of perfect or imperfect self-defense depended upon the intent with which the assailant brought on the quarrel.

If he provoked the combat, or produced the occasion in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing will be murder in the first degree, no matter to what extremity he may have been reduced in the combat.  If, on the other

hand, he had no felonious intent, intending merely an ordinary battery, and during the progress of the fight is compelled to take the life of his adversary in order to save his own, he is guilty of manslaughter; or if, having entered into a fight without felonious intent, he seeks in good faith to abandon it and withdraws as far as he can, and his adversary still pursues him, then if necessary to save his own life he slay his opponent, he will be justified.

At common law words of reproach, how grievous soever, were not provocation sufficient to free the party killing from the guilt of murder, nor were contemptuous or insulting actions or gestures without an assault upon the person, nor was any trespassing against lands or goods to have the effect to reduce the guilt of killing to a grade of manslaughter; the provocation must consist of personal violence. [1 East's Pleas of the Crown, 233; 4 Blackstone, Com., 201; State v. Wieners, 66 Mo. 13.] And the common-law rule in this respect is firmly established in this State by a long line of decisions. [State v. Starr, 38 Mo. 271; State v. Branstetter, 65 Mo. 149; State v. Hill, 69 Mo. 451; State v. Elliott, 98 Mo. 150; State v. Gartrell, 171 Mo. 516-519.]

Recurring now to the latter clause of instruction number ten given by the court, and measuring it by the foregoing established principles of criminal law in this State, and in the light of the testimony, was it a correct guide to the jury, or is it open to the objection urged by the defendant on this appeal? It is to be observed in the first place that it predicates the guilt of the defendant of manslaughter in the fourth degree upon one of two alternatives, either that the defendant brought on, *or* voluntarily entered into the said difficulty and stabbed and killed Doelling, and in either case deprived him of the right of self-defense. It does not tell the jury that if the defendant brought on the difficulty by any wrongful or unlawful act of his with a design to commit a battery or an assault without any felon-

ious intent to take advantage of the quarrel thus begun and to kill Doelling or do him some great bodily harm, then he was guilty of manslaughter only. But it, in effect, directs the jury that if he voluntarily entered into the difficulty, even though he had committed no assault or offered any personal violence to the deceased, but had only applied an insulting epithet or opprobrious language to the deceased, and the deceased, upon this provocation only, had assaulted him and the defendant had voluntarily resisted the assault thus made upon him by the deceased, still he had no right of self-defense.

It has been ruled in various cases by this court that self-defense is an affirmative, intentional act, and in that sense is voluntary, and while, perhaps, it was too strongly put in State v. Rapp, 142 Mo. l. c. 448, to say that, "Voluntarily entering into a difficulty is not an ingredient of any homicidal crime," as was said in that case, still we think it is clear that when one is assaulted by another and he neither brought on nor voluntarily entered into such a difficulty with a view to take advantage of a quarrel begun between him and his opponent, he does not forfeit his right of self-defense by voluntarily resisting the assault made upon him, and if the circumstances are such that when thus assaulted he has reasonable cause to believe and does believe that his opponent then and there entertains a design to kill him or do him some great bodily harm, and there is imminent danger of the accomplishment of such design, then he may resist the accomplishment of such a purpose by killing his adversary to prevent the accomplishment of such a purpose. In the instruction we are considering, the court told the jury that although they might "find from the evidence that the defendant did not bring on or enter into said difficulty with a view to take advantage of the quarrel thus begun and to slay Doelling or to do him some great bodily harm, the defendant could not be justified on the ground of self-defense,

and the killing was manslaughter in the fourth degree, no matter how hard pressed defendant was or how imminent his peril may have become during said difficulty.'' In other words, although the jury might have found that the defendant did no more than apply words of abuse and opprobrious epithets to the deceased Doelling, and did not assault him, and that Doelling first assaulted the defendant by striking him with his fist, and was the aggressor in the difficulty, yet if the defendant voluntarily entered into the difficulty to the extent of defending himself, then the defendant forfeited his right of self-defense. While it may have been the intention of the court to have instructed the jury that if the defendant provoked the combat or produced the occasion intending merely an ordinary battery, and during the progress of the fight was compelled to take the life of Doelling in order to save his own, he was guilty of manslaughter, we think the instruction failed to declare the law in such circumstances, but entirely deprived the defendant of the right of self-defense if he voluntarily entered into such difficulty though his only purpose was to defend himself against the unlawful assault of Doelling upon him. It is insisted by the Attorney-General that this instruction in no manner attempts to deal with the question of self-defense save to eliminate it under the facts predicated, and that the doctrine of self-defense was fully presented in another instruction on that subject. We agree with the Attorney-General that the instruction eliminates the right of self-defense from the case if the jury should find that the defendant voluntarily entered into the combat even to defend himself against the assault first made upon him by the deceased, Doelling, an opponent greatly his superior in weight and strength, and even though in the combat thus commenced by Doelling there was reasonable cause to apprehend he was about to slay defendant or do him some great bodily harm. We concede that there has been much indefinite language used in defin-

ing the rights and duties of parties in these homicide cases, and that this court has in some cases approved instructions much like the one under consideration, but since the decision in the Partlow case, the circuit courts and this court have discarded the doctrine that the mere voluntarily entering into a difficulty in defense of one's life or limb deprives him of his right of self-defense.

That we may not be misunderstood, we hold there is a radical and well-defined distinction between the right of one who brings on or provokes a difficulty with another with the felonious purpose of wreaking his vengeance by killing him, to avail himself of the right of self-defense even though in the attempt to perpetrate his crime he finds himself in imminent peril, and the right of one who neither seeks nor brings on a difficulty, but who finding himself assaulted exercises his right of self-defense. Likewise, we think it is equally clear that if one wrongfully commences a difficulty by assaulting another and only intends to commit a misdemeanor or ordinary battery, and in the course of the combat finds it necessary, in order to save his own life, to slay his adversary, he still has the imperfect right of self-defense, and a homicide committed by one under such circumstances, even though he was at fault in the beginning, is only manslaughter, because he had no felonious purpose in bringing on or provoking the difficulty, and yet such a case is different from that which is disclosed in the record before us. Doelling, the deceased, in his dying declaration, and the defendant, the only two witnesses who speak of the commencement of the combat in which defendant stabbed Doelling, both agree in saying that the deceased assaulted the defendant by striking him a blow with his fist on the side of the temple. Deceased says he did this because defendant applied a foul epithet to him, and the defendant drew his knife after he was struck by deceased and stabbed deceased. On the other hand, defendant testified he did not use the foul language attributed to him, but said to deceased

that he, defendant, "was d—n tired of fooling with him and the account too," and thereupon deceased struck him with all his might in the temple, and a fight then ensued in which deceased got the defendant around the neck with his left hand and pounded him with his right fist and while in this situation defendant drew his knife and stabbed deceased. Now upon the conceded facts what was the right of the defendant? Conceding that deceased was right and defendant wrong as to the use of the insulting epithet, and that defendant did apply the opprobrious terms to deceased, clearly this was not a provocation which would justify deceased in making a felonious assault upon defendant, and if he had killed defendant upon such a provocation his offense would have been murder, not manslaughter.

In Boatwright v. State, 89 Ga. 140, it appeared that the deceased, under provocation of opprobrious words, attacked the defendant with a stick, and it was held that "where a battery with a weapon likely to produce death was being committed by the deceased upon the slayer when the mortal blow was given, the fact that he provoked the battery by the use of opprobrious words would not put the slayer in the wrong for resisting it so far as was necessary to his defense; and a seeming necessity, if acted upon in good faith, would be equivalent to a real necessity."

In Butler v. State, 92 Ga. 601, it was ruled that if the assault upon the accused was made with a weapon likely to produce death and in a manner apparently dangerous to life, the fact that the accused provoked the assault by opprobrious words would not put him in the wrong for resisting it so far as necessary to his defense. And this must be true in this State. Either the law is that mere words of reproach or opprobrious epithets are not a sufficient provocation to justify an assault upon the person using them, or they are. If they are not, as this court has always declared, then the de-

ceased was not justified in law in assaulting and striking defendant, even though we accept deceased's account of the beginning of the difficulty; and this being true, defendant was not in the wrong when resisting the assault thus made upon him, and it was not correct to apply to him the law as to one who was in the wrong in the first instance, either in provoking a difficulty with a design and intent to slay his adversary, or even the case of one who sought or provoked a difficulty by a wrongful act but intended to commit only a misdemeanor or battery. In this case, if the evidence of the deceased and defendant, who alone testify as to the commencement of the difficulty, is to be credited, defendant did not give the deceased any provocation which the law recognizes which would have justified the assault made by the deceased upon defendant, and hence, the defendant had a right to defend himself against that assault and to do so voluntarily, and considering the great disparity in weight and size and the character of the assault, it should have been submitted to the jury whether defendant had not reasonable cause to apprehend that deceased was about to kill him or do him some great bodily harm. Our conclusion is that in the light of the more recent decisions of this court since the Partlow case, notwithstanding there are cases which seemingly conflict with the view, it is error to instruct that a defendant in a personal altercation forfeits the right of self-defense merely because he voluntarily engages in a difficulty. The occasions on which this right is forfeited have been pointed out in the foregoing excerpts from the decision in State v. Partlow, 90 Mo. 608, and in cases cited. The tenth instruction as applied to the facts in this record was, in our opinion, misleading and erroneous. It was not made applicable to the state of the testimony and should not have been given even when modified by omitting the clause as to "voluntarily entering into the difficulty," without fully advising the jury as to what constitutes

provocation that will justify an assault and as to what is meant by "provoking a difficulty" or "being free from fault." Mere words of reproach or opprobrious epithets do not constitute such provocation as would put the defendant in any degree in the wrong if it became necessary to kill Doelling in his own defense.

II. The criticism of instructions 3 and 6, on the ground that they assume that the knife with which defendant stabbed deceased was a deadly weapon, is without merit. Both instructions submit the question as one of fact to the jury. [State v. Weeden, 133 Mo. 83.]

III. As to the alleged failure to submit to the jury whether the dying declaration was in fact made, we think there was no just ground of complaint. Defendant asked and obtained an instruction (No. 12) which assumed a dying declaration had been made and was exceedingly favorable to defendant. Besides, such omission can readily be supplied on another trial.

IV. The instruction on reasonable doubt was substantially correct, but we again approve the formula expressed on this subject in State v. Nueslein, 25 Mo. 111.

V. The defendant prayed the court to declare the law to be as follows:

"1. If the jury believe from the evidence that at the time of the killing of the deceased Doelling, as charged in the indictment, the defendant Gordon went to the business house of said Doelling, in Columbia, to collect a claim theretofore placed in his hands as an attorney, for collection, and that then and there an angry controversy suddenly arose between said parties, followed by blows inflicted with his, Doelling's, fists, on the head, face or body of said Gordon, and that said Doelling was a large, athletic and powerful man, and that Gordon was physically a small man, under the average of strength and power, and that he had reasonable cause to believe that deceased then and there entertained a design to do him (Gordon) some great per-

sonal injury, with his fists, by reason of his (Doelling's) superior physical strength, and that there was then and there imminent danger of the accomplishment of such design, then the defendant Gordon was justified, under the law, in cutting or stabbing the deceased and even to kill him (deceased) to prevent the accomplishment of such design, even though the jury shall further believe from the evidence that said Doelling was unarmed at that time.

"2. If the defendant had reasonable cause to believe from the words, acts and conduct of the deceased that he had a design to do him some great personal injury, and that such design was about to be accomplished, then defendant had a right to act on appearances, and to cut or stab deceased to prevent the accomplishment of such design, and in this connection the jury are further instructed that defendant was not required to nicely gauge the force used, but that he could use any means that appeared reasonably necessary under the circumstances. Neither is it necessary to this defense that his danger should have been real or actual or that it should have been impending and about to fall, but if he had reasonable cause to believe, and did believe these facts, and cut the defendant to prevent such expected harm, then you must acquit on the ground of self-defense."

The circuit court modified these two instructions by adding the words "if necessary." In the first, those words were inserted in the third line from its conclusion after the words, "And even to kill him, deceased, if necessary."

In the second of said instructions, the words "if necessary" were inserted after the words in the fifth line, "then defendant had a right to act on appearances and to cut or stab deceased, if necessary." The words "if necessary" add nothing to the clearness of the legal propositions asserted in these instructions. The instructions were correct without them, and while the

legal mind might reconcile them with the remainder of the instructions, they were calculated to impress the jury with the idea that the danger to defendant must have been in fact real or actual, or that he must use exactly the amount of force necessary to defend himself and no more, whereas it is the settled law of this State that it is not necessary, in order to acquit on the ground of self-defense, that the danger should have been real or actual or that such danger should have been then impending and about to fall on defendant. It is only necessary that the jury shall believe that the accused had reasonable cause to apprehend that there was immediate danger of a design to commit a felony or to do great bodily harm to the defendant about to be accomplished.

VI. As a reversal of the judgment results from the errors already noted, it is unnecessary to consider whether the court erred in refusing a new trial on the ground of the incompetency of two jurors, further than to say it was a question of fact which the circuit court determined, and it would require an exceptionally flagrant abuse of discretion to justify our interference on such a ground. For the reasons assigned the judgment must be reversed and the cause remanded for a new trial in accordance with the views herein expressed and it is accordingly so ordered.

*Burgess, P. J.,* and *Fox, J.,* concur.