178 P.2d 592

**STATE v. YOUNG.**
**No. 4999.**

Supreme Court of New Mexico.
March 19, 1947.

Fletcher Catron and Frank Andrews, both of Santa Fe, and Gilberto Espinosa, of Albuquerque, for appellant.

C. C. McCulloh, Atty. Gen., Robert W. Ward, Asst. Atty. Gen., and David W. Carmody, Dist. Atty., of Santa Fe, for appellee.

BRICE, Chief Justice.

The defendant was convicted of having murdered Mrs. Eloise Kennedy. Following his conviction he was sentenced by the trial court to be electrocuted. From this judgment he has appealed to this court.

On the 19th day of November, 1945, in the City and County of Santa Fe, in this state, the deceased, a young married woman, was brutally murdered in her apartment, one of several in an apartment building. About 2:30 o'clock P.M. on that day, her husband, Leon G. Kennedy, Jr., communicated with her by telephone. Thereafter, at 3:00 o'clock he again telephoned to the apartment but received no answer. From these circumstances it is presumed she was murdered at sometime between the hours named. At 5:30 o'clock on the same afternoon, her husband found her dead body lying face down on the bathroom floor in their apartment. He called a physician who arrived within from five to ten minutes. The doctor testified that at the time he arrived she had been dead from three to three and a half hours. A mortician was called, who covered the body with a sheet and placed it on a stretcher in the position in which it lay on the floor, and removed it to a mortuary. In lifting the body it was found to be lying in a pool of blood, from which it was then thought Mrs. Kennedy had died from a hemorrhage. She had given birth to a baby less than five weeks before. At the mortuary it was discovered that she had been murdered, and the doctor and police officers were called. It was found upon examination that she

had nine knife wounds and two contusions on her body. There were a number of wounds on her left shoulder; one of two ragged gashes on the left side of her neck had severed the jugular vein, and a stab had penetrated the outer covering of the heart. There was a small, fresh wound, made that day, in her vagina, at the location of a childbirth laceration, and a blood stain therefrom was found on her panties. This did not necessarily prove an attempt to rape. It could have been caused by a strain, struggle, or fall. No spermatozia was found in the vagina. Her levis were torn from the right side of the waist to the right knee, which required considerable force.

On the day following the murder a butcher knife, with human blood on it, was found in a pile of leaves at the rear of the Kennedy apartment. This knife belonged to Chief of State Police Frank Young, and was kept in the kitchen of his apartment, only a few feet from the Kennedy home.

The defendant was a convict "trusty," who had been assigned as a laborer to the state police headquarters. He was serving his fourth term in the state penitentiary for the crime of burglary. Chief Young sent him twice each week to his apartment to do yard and other menial work. A day or two before the murder the defendant had used the knife mentioned to quarter a hog in Chief Young's kitchen. On the day Mrs. Kennedy was murdered the defendant was sent to Chief Young's apartment to work. None of the Chief's family were at home.

On the day of the murder, Mrs. Flanigan, who lived in one of the apartments, employed defendant to wax her floors. There is evidence to the effect that he did not wax these floors, although he was paid for it. He was in or around these apartments from the time he arrived in the morning until after four o'clock in the afternoon. There is no evidence that any other man was seen around them, with the exception of Frank Flanigan, who, with his wife occupied another of the apartments, and who was there only during lunch time.

Clothing worn by the defendant and by the deceased, and fingernail scrapings from each, and some knives, were sent to the Federal Bureau of Investigation in Washington, D. C., for examination. T. D. Beach, a special agent of that department, and its principal analytical chemist, testified regarding the condition of the clothing, and other things sent to the Bureau. He stated that he examined the articles for blood stains, the presence of hairs, fibers, etc., and made chemical examination of stains and microscopic examination of materials. This witness testified that he found human blood on Mrs. Kennedy's levis, shirt, shoes, panties, brassiere, and in scrapings from her fingernails. He also found human blood stains on the butcher knife mentioned, and on defendant's trouser leg, and in the inside

of the defendant's right trouser pocket; at two places on the front of his shorts; and on the lower part of the front of his undershirt, and on one of his shoes.

The Kennedys had a black Scottie dog in the apartment and black canine hairs were found on defendant's trousers and shoes, but it could not be determined whether they were from the Kennedy dog; but they were black and appeared to be like those taken from him.

Mrs. Flanagan went through the Kennedy apartment, calling Mrs. Kennedy at about 2:30 P.M. on the day she was murdered, but received no answer. She went back to her own apartment and from there to the Young's back door and called defendant, but he did not answer. She then went to her own apartment and out the front door and saw the defendant, about 2:45 o'clock "at the end of the fence." At that time he had a waxer in his hand, and when she saw him last he was standing at the front gate with his back to her.

The police examined the defendant's clothing and did not find the several blood spots that were on them, which were later found at the laboratory in Washington.

On the night of November 21, following the death of Mrs. Kennedy, the defendant signed a typewritten confession admitting that he killed the deceased. His confession was in answer to questions propounded by police officers, the substance of which is as follows:

On the morning of November 19th he arrived at Chief Young's apartment between 7:30 and 8:00 o'clock. He had access to the Chief's apartment and practically everything in it. He worked there until one P.M. After Mr. and Mrs. Flanagan left, he went to Mrs. Kennedy's apartment. He stated: "I figured I would get some, that she would let me, but I did not figure on hurting her." He took the butcher knife from Chief Young's apartment to cut rags for waxing Mrs. Flanagan's floors. He had it in a pocket of his overalls at the time he went to Mrs. Kennedy's apartment. He knocked at the door and Mrs. Kennedy admitted him. They talked awhile about work. Mrs. Kennedy went into the bathroom and he followed her and "asked her for a date." He said he meant "going to bed." Mrs. Kennedy told him that she would tell on him. He got scared and stabbed her with the butcher knife which he had in his pocket. He first stabbed her in the left shoulder, he didn't know how many times. He then stabbed her several times. He stabbed her once after she fell. He didn't know how many times he stabbed her in all. She talked after he stabbed her, but he did not remember what she said. He tore her levis after she was down on the floor in the bathroom. He "caught her pants and jerked them." It took five or ten minutes to kill the deceased. He heard someone walking (probably Mrs. Flanagan), and went out at the back door. After kill-

ing Mrs. Kennedy he threw the knife in some leaves in a gully back of the Kennedy apartment, and then went to the Flanigan apartment and waxed the floors. He saw blood on the knife, but saw none on his clothing. He did not go to Mrs. Kennedy's apartment to rape her.

The foregoing confession was admitted in evidence.

It is asserted that the trial court erred in refusing to give to the jury the following requested instruction:

"The Court instructs the jury that 'malice aforethought,' as that term is used in the definition of murder which has been given you, is divided into two kinds: express malice and implied malice.

"Express malice is defined as that deliberate intention, unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof, *such as previous difficulties or threats or lying in wait or like circumstances.* As here used the word 'deliberate' means 'thought of with a calm and reflective mind.' Such malice must be shown by direct proof and may not be inferred, from the absence of provocation.

"Implied malice is defined as that malice which as a matter of law is considered to exist when no considerable provocation appears for the killing with which the accused is charged, or when all the circumstances of the killing show a wicked and malignant heart."

The trial court gave to the jury all of the above requested instruction except that portion in italics. The instruction as given has been used by the courts of this state and of the territory before statehood, in instructions in murder cases, for many years. We are of the opinion that it is sufficient and all that was required to properly inform the jury regarding the law of express and implied malice.

In any event the requested instruction should not have been given because there was no evidence of any "previous difficulties, threats, lying in wait, or like circumstances." The fact that the defendant, before going to Mrs. Kennedy's apartment, had determined to go there for the purpose of making an indecent proposal to her and took with him the butcher knife with which he killed her, was sufficient evidence from which the jury could infer express malice and a deliberate design to take her life if she refused his request for sexual intercourse, a refusal which, under the circumstances he had strong reason to expect.

The proposed illustrative instruction would have served only to mislead the jury. It would in effect have advised the jury that the external circumstances which would evidence deliberation were limited to "previous difficulties, threats, lying in wait, or like circumstances." If one arms him-

self with a deadly weapon, seeks his victim and kills him without provocation, none of the illustrations would apply. State **v.** Ybarra, 24 N.M. 413, 174 P. 212.

It is argued in this connection that the trial court "did not instruct the jury properly as to the elements of murder in the second degree." If there was such failure on the part of the trial court, it was not called to its attention, except as to the failure to give the requested instruction mentioned. But we are satisfied that the trial court sufficiently instructed the jury on all phases of murder in the second degree; and it did not err in refusing the requested instruction.

It is asserted that the trial court erred in refusing to give defendant's requested instruction No. XIV on voluntary manslaughter and in giving its purported but incomplete instruction No. XIV in lieu thereof.

Defendant's requested instruction No. XIV is as follows:

"The Court instructs the jury that if in the present case you believe from the evidence which has been introduced, beyond a reasonable doubt, that the defendant killed Eloise Kennedy, but you further believe from the evidence introduced that he so killed her without malice, ~~upon a~~ sudden quarrel, upon such emotions or in the ~~heat of passion engendered by fear or terror,~~ then the defendant is guilty of and you should find him guilty of voluntary manslaughter."

(Defendant's counsel state that the portions lined out were deleted without the knowledge or consent of the defense.)

The trial court's instruction No. 14 is as follows:

"The Court instructs the jury that if in the present case you believe from the evidence which has been introduced, beyond a reasonable doubt, that the defendant killed Eloise Kennedy, but you further believe from the evidence introduced that he so killed her without malice, upon such emotion of anger, rage or sudden resentment or terror as may be sufficient to obscure the reason of an ordinary man and to render the defendant incapable of cool reflection."

That the instruction given is incomplete, is obvious; and that the requested instruction including the deleted portions, is incorrect is equally obvious. There is no evidence of a "sudden quarrel," and a homicide committed in the "heat of passion engendered by fear or terror" is not always manslaughter. But the fear or terror must be sufficient to obscure the reason of an ordinary man, so that he is incapable of cool reflection, and of forming a deliberate design to kill, and does not act with malice. State v. Kidd, 24 N.M. 572, 175 P. 772; State v. Wright, 38 N.M. 427, 34 P. 870.

The defendant did not object to the incomplete instruction, or tender a proper one. The appellee invokes Trial Court Rule No. 20—108, as follows:

"For the preservation of any error in the charge, objection must be made or exception taken to any instruction given; or, in case of a failure to instruct on any point of law, a correct instruction must be tendered, before retirement of the jury. Reasonable opportunity shall be afforded counsel so to object, except or tender instructions."

Appellant cites State v. Williams, 39 N.M. 165, 42 P.2d 1111, and State v. Mitchell, 43 N.M. 138, 87 P.2d 432, 434. In the Mitchell case we said:

"The rule is well settled that the court's failure to instruct on some features of the case will be reviewable error only when and if the party has requested proper or correct instructions upon the subject. We have held heretofore (State v. Williams, 39 N.M. 165, 42 P.2d 1111) that the rule requiring the submission of correct and proper instructions before error in refusing to give some instruction upon the question may be reviewable, 'must be consistent with and sometimes give way to the higher consideration of justice,' and appellant here was clearly entitled to have the question of simple assault submitted. The court was advised of this desire by a sufficient though perhaps not altogether technically accurate or complete instruction."

Also see State v. Plummer, 44 N.M. 614, 107 P.2d 319.

■ But we need not decide this question, as we are of the opinion that there was no evidence which authorized the trial court to submit to the jury the issue of manslaughter. The only evidence on the question was in substance that he went to Mrs. Kennedy's home to solicit intercourse with her; that she threatened to tell of his insult; and he killed her because he was "scared." "Scared" of what? Not of the loss of his life or of bodily injury, or of anything that the deceased might have done at that time and place; but presumably that he would lose the privileges he enjoyed as a convict "Trusty." There is no evidence of fear or terror of anything imminent. Does "heat of passion" as used in the statute include apprehension of the loss of such privileges in the future, if the apprehension is engendered by his own lascivious conduct? We are of the opinion that it does not.

In State v. Nevares, 36 N.M. 41, 7 P.2d 933, 935, this court, in a well considered opinion written by Justice Sadler, stated that:

"Mere sudden anger or heat of passion will not reduce the killing from murder to manslaughter. There must be adequate provocation. The one without the other will not suffice to effect the reduction in the grade of the offense. The two elements must concur."

The defendant in that case killed a young woman because she refused to associate with him after an estrangement that had taken place some time before. Undoubtedly the killing occurred in the heat of passion, but we held as a matter of law that the fact that he was so enraged because of her refusing his advances as a suitor that he killed her, did not reduce the grade of the offense from murder. The English rule is cited in this case and followed, wherein it was held that different degrees of mental ability in defendants who are sane, could not be taken into account for reducing a homicide from murder to manslaughter, that "There must exist such an amount of provocation as would be excited by the circumstances in the mind of a reasonable man, and so as to lead the jury to ascribe the act to the influence of that passion."

The English court in Rex v. Lesbini [1914] 3 K. B. 1116, British Ruling Cases, 272, cited by Justice Sadler, stated further:

"This court is certainly not inclined to go in the direction of weakening in any degree the law that a person who is not insane is responsible in law for the ordinary consequences of his acts."

This court then said:

"The test of whether the provocation was adequate must be determined by considering whether it would have created the passion offered in mitigation in the ordinary man of average disposition. If so, then it is adequate and will reduce the offense to manslaughter. If not, it is inadequate. Here is shown nothing but words apprising appellant of the fact that the deceased had rejected his suit, except testimony tending to show that by reason of his peculiar, even defective, state of mind, not amounting to insanity, such knowledge likely would result in a state of excitation and anger in him, altogether not to be expected in the ordinary man of average disposition. This circumstance does not alter the rule."

The following instruction to a jury, regarding voluntary manslaughter, was approved by the Supreme Court of the United States:

"* * * Speaking of voluntary manslaughter, it (the common law) says it is the willful and unlawful killing of another on sudden quarrel, or in the heat of passion. Let us see what is meant by this definition. The party who is killed, at the time of the killing, must offer some provocation to produce a certain condition of mind. Now, what is the character of that provocation that can be recognized by the law as being sufficient to reduce the grade of the crime from murder to manslaughter? He cannot produce it by mere words, because mere words alone do not excuse even a simple assault. Any words offered at the time do not reduce the grade of the killing from murder to manslaughter. He must

be doing some act—that is, the deceased, Philip Henson in this case, the party killed —which at the time is of a character that would so inflame the mind of the party who does the killing as that the law contemplates he does not act deliberately, but his mind is in a state of passion, in a heat of passion, where he is incapable of deliberating." Allen v. United States, 164 U.S. 492, 494, 17 S.Ct. 154, 155, 41 L.Ed. 528.

It was held by the Supreme Court of Missouri that the "lawful provocation" which will reduce murder to manslaughter at common law consists, with very few exceptions, of personal violence. That court said in State v. Myers, 221 Mo. 598, 121 S.W. 131, 136:

"In State v. Bulling, 105 Mo. [204,] 225, 15 S.W. [367,] 373, 16 S.W. 830, it was expressly ruled by this court that the heat of passion contemplated by the statute, which would reduce a killing from murder in the first or second degree to manslaughter in the fourth degree, 'is that heat of passion which is produced by a "lawful provocation" as that term was understood at common law,' and it was held in that case that the terms 'legal,' 'lawful,' 'adequate,' and 'reasonable,' when used as adjectives qualifying 'provocation,' are synonymous terms, and then announced the general rule that, with very few exceptions, it takes an assault or personal violence to constitute the provocation as contemplated by the use of those terms.

\* \* \* \* \* \*

"In State v. Gordon, 191 Mo. [114,] 125, 89 S.W. 1025, 1028, 109 Am.St.Rep. 790, the rule as applicable to this subject was thus announced: 'At common law words of reproach, how grievous soever, were not provocation sufficient to free the party killing from the guilt of murder; nor were contemptuous or insulting actions or gestures an assault upon the person; nor was any trespassing against lands or goods to have the effect to reduce the guilt of killing to a grade of manslaughter. The provocation must consist of personal violence. East's Pleas of the Crown, 233; 4 Blackstone, Comm. 201; State v. Wieners, 66 Mo. 13. And the common-law rule in this respect is firmly established in this state by a long line of decisions."

"At common law mere language, however aggravating, abusive, opprobrious or indecent, is not regarded as sufficient provocation to arouse ungovernable passion which will reduce a homicide from murder to manslaughter. This effect will not be given to any insult or epithet, when dissociated with actual or threatened assault, or to any indecent or provoking actions or gestures. The character of the words or conduct has no bearing on the question of sufficient provocation. No distinction is drawn between language of the one sort

and the other; threats when unaccompanied by assault do not constitute adequate provocation." 26 A.J., Homicide, Sec. 29.

Also see Territory v. Anderson, 4 N.M. 213, 13 P. 21.

At most the provocation was only a threat; and if a threat is ever a "lawful provocation," it was not so in this instance. No ordinary man of average disposition (the test applied in State v. Nevares, supra) would have been so terrified by such threats that he would kill a defenseless woman. Only one with a wicked and malignant heart could do so.

It has been held by this court that voluntary intoxication which caused the "heat of passion" that resulted in a homicide, does not reduce it to manslaughter. State v. Brigance, 31 N.M. 436, 246 P. 897; State v. Aragon, 35 N.M. 198, 292 P. 225; and we now hold that a threat to inform, brought about by the defendant's own wrongful and lascivious act, is not such lawful provocation as will reduce a murder committed because of it, to manslaughter.

■ The giving to the jury of the instruction on manslaughter was harmless error.

It is asserted that the trial court erred in admitting in evidence the confession of the defendant, in that this denied to defendant due process of law, as guaranteed to him by the 14th Amendment to the Constitution of the United States. The question is whether the confession was coerced or was otherwise involuntary.

Before the trial court admitted the confession in evidence, testimony was taken in the absence of the jury to determine its admissibility. The manner and means used, and surrounding circumstances regarding the obtaining of the confession as claimed by the respective parties, were detailed by state's witnesses and the defendant. Upon the conclusion of this testimony the trial court admitted the confession in evidence over the objection of the defendant. The written confession, the substance of the material parts of which has been stated, was prefaced by the following statement dictated by Mr. Clancy, in the presence of the defendant, and acquiesced in by him:

"Santa Fe, New Mexico,
"November 21, 1945
"10:30 P.M.

"I, Louis Young in the presence of Chief Frank Young, Assistant Chief A. B. Martinez, both of the State Police of New Mexico, Manuel Montoya, Chief of Police of Santa Fe, New Mexico, Eddie Mack, Special Investigator of the District Attorney, of the first judicial district of New Mexico, and Albert H. Clancy, Assistant District Attorney, for the first judicial district of the State of New Mexico, do hereby make this voluntary statement; I state in the presence of these men that I have been advised of my constitutional rights; I state that I have been advised

by the Assistant District Attorney that under the law I am entitled to the advice of counsel and that I have the privilege of calling in a lawyer; I have been further advised that I have not been made any promises of immunity or help of any kind; and I have been further advised that any statements that I may make may be used against me, and I reiterate that this statement is made voluntarily without being threatened in any way and it is made of my own free will and accord.

"I further state that on Monday night November 19, 1945, I made a statement to Chief Frank Young, Captain A. B. Martinez and Assistant District Attorney Albert H. Clancy, which I now repudiate.

"I further state that on the afternoon of November 20th, 1945, I made a written statement in the office of the District Attorney at Santa Fe, New Mexico, which said statement I now repudiate.

"I further state that at the Coroner's inquest held in the Memorial Chapel at Santa Fe, New Mexico, late in the afternoon of November 20th, 1945, that I was placed under oath and testified at said inquest. This testimony I now repudiate."

Captain Martinez of the State Police testified that all persons, including defendant, who may have been in the vicinity of the Kennedy apartment at the time of the homicide, were questioned at city police headquarters on the night thereafter. The next day defendant was questioned at the district attorney's office, and he was a witness on the afternoon of the same day at the inquest. Other references were made to these questionings, but there is nothing in the record regarding the time taken, or any other detail connected therewith, except that on each of these occasions defendant denied that he killed the deceased; and that he was advised that he was entitled to the advice of an attorney; and that he was not compelled to answer questions. There is nothing to indicate that he was mistreated or that any attempt was made to coerce him into making a confession. He was illiterate, but a surprisingly intelligent witness.

We come now to the questioning of defendant that resulted in his confession of having committed the homicide.

At 10:30 P.M. on the night of November 21, 1945, the defendant was questioned regarding the homicide, in the inner office within the walls of the state penitentiary. Between 9 and 9:30 on that evening Captain A. B. Martinez of the State Police and Assistant District Attorney Albert Clancy were in the inner office. In an outer office there were present Frank Young, Chief of State Police; W. L. McDonald a prison guard; Manuel Montoya, Jr., Chief of Police of the city of Santa Fe, and Eddie Mack, special investigator for the district attorney. There was a flat-topped desk in

the inner office, on which lay four butcher knives, the property of Chief Young. The defendant was brought into this office for questioning. He was advised that he did not have to make a statement, that he was entitled to the counsel of an attorney but that any statement he made would have to be voluntary and made without any promises or threats. The knives were shown to the defendant and he denied having ever seen them. He was questioned about thirty or forty minutes by the assistant district attorney regarding the homicide, Mr. Clancy insisting that he tell the truth, but he persistently refused to admit his guilt. The above testimony is in substance that of Captain Martinez and assistant district attorney Clancy. At this time Chief Young was called into the room and placed a blood-stained butcher knife on the table, one of a set to which the other four belonged. The defendant looked at the knife, hesitated and said, "I did it, I will tell you all about it." The above was testified to by the three officers present.

At this time the other officers named were called into the room to witness the statement. Defendant was again told of his constitutional rights, that he was entitled to an attorney if he wanted one; that under no circumstances would he have to say anything, but that anything he might say would be used against him; that if he made a statement it would have to be voluntarily made, and it was the opinion of the witnesses that defendant understood his rights as stated to him by the officers. The witnesses testified that defendant sat quietly, that no attempt was made to coerce him, nor were any threats made to elicit evidence from him. He asked for a cigarette and a full package was given him; coffee was brought in and served to all, including the defendant. It was about 10:15 when the defendant stated that he would tell everything and about 10:30 when the questioning began by the assistant district attorney. Defendant was told that he had been well treated by Chief Young. Nothing was said to him about his having been seen coming out of the Kennedy apartment or about finger prints being on the knife. The questions were asked by Mr. Clancy, answered by defendant, and typed by Captain Martinez. One question and answer was eliminated and the page rewritten and reread to the defendant and he understood it before signing this page. The defendant did not ask to lie down on the floor. After the confession was written it was read to the defendant by Chief Young. The defendant was sitting in a chair and was not tied. At one time he slumped in his chair for two or three seconds, as though drowsy. Mr. McDonald tapped his arm and asked him what was the matter, and he straightened up and asked to go to the toilet. The blood-stained knife and the other knives on the table were a part of the same set, and belonged to Chief Young and were kept in

his apartment in the same apartment house in which the Kennedys lived. Chief Frank Young made the following statement, among others:

"I asked him if he knew that knife and he looked at it and studied it just a short while and said 'Yes sir, it is your knife and it came out of your kitchen,' and I said, "Well, Louis, if you want to make the statement tell this man the truth; and he sat there, hesitated, and said, 'I did it, and I will tell you all about it.' I would not think I was there over ten minutes."

The defendant was sitting in a chair, appeared to be comfortable and calm, he was not nervous. He was not put under any physical compulsion and his statement was free and voluntary. He initialed the pages and signed the last one. After the confession was typed it was read to the defendant, just as it now appears, before he signed it.

The foregoing testimony regarding the taking of the confession was substantially that given by the six officers who were present.

After the State had closed, the defendant testified in great detail. He stated that on the evening of the 19th of November he was brought into the back office on the inside of the prison yard, and that Captain Martinez and Mr. Clancy were present. He was given a chair in which to sit. He stated that Mr. Clancy had told him that two people had seen him coming away from Mrs. Kennedy's apartment and that these witnesses were then available. He was asked if he cared for Chief Young, Mrs. Young, their daughter, and others; and he answered that they had always treated him like a child and that he loved them; that Captain Martinez then began hitting one fist into the other and said, "They are all over there crying, worried about you, if you care for Mrs. Young you will tell us the truth in this case." He answered that he had already told them the truth. Captain Martinez then said "Do you know that Chief Young and his family is all in an uproar, everybody in Santa Fe loves Chief Young and his family, and Mrs. Kennedy is well thought of." "I say, 'Yes, I like the people and Mrs. Kennedy * * * but if I have to go to my grave and one of you was to put a gun on me now I would die saying I did not know anything about it.'." He stated that he had never seen any knives at Chief Young's home; that they continued to insist that they were there to hear the truth from him, and he said "I have told you the truth each time I have talked to you, from here to God." He stated that Captain Martinez said to him "I hate to get mad at you and the only thing that will keep me from getting mad at you is that you will come on and tell us that you did kill Mrs. Eloise Kennedy." And that he answered, "That would be a story; when I have sworn each time I have told you the truth." He stated

that he was in the upper end of Mrs. Young's room when Mrs. Flanagan left in her car; and again he stated that Captain Martinez insisted on him telling that he killed Mrs. Kennedy and thereby help Chief Young and Mrs. Young and Mrs. Kennedy's husband. He stated that he heard Mrs. Flanagan call Mrs. Kennedy early in the morning while he was in Mrs. Young's kitchen; that he said to Captain Martinez "If you want me to tell you a story I can tell you one and you all write it down, but some day somebody will read it and find out I did not do it. I say, 'Of course there is nothing for me to do. I don't know what you all is going to do with me, but if it will please you all I will say yes.'" He said that Chief Young came in, threw a knife on the table and said "That is the knife you used." "I sat there and looked at the knife. I did not know what to say because I knowed I had not used it, but I did not know what they was going to do to me if I did not answer the question like they wanted me to, from the way they had been talking to me, and I say 'I reckon I did,' and I got these words to face now and press my dying pillow." They brought in a typewriter and Mr. Clancy began asking questions. Chief Young began to read the statement. They gave the warning after the last writing on the page was signed. "They told me at the court house that I could have an attorney. At the time the paper was written in the penitentiary no lawyer nor nothing was mentioned until my name was signed to the paper. The answers on the paper are all false.

"Q. When you gave your statement what did you think they were doing? A. I gave that statement to stop Mrs. Young and them from crying.

"Q. You thought they were in difficulties? A. Yes sir.

"Q. And you wanted to help them? A. Yes sir."

He stated that while Chief Young was reading the statement he became unconscious, and when he "knew anything he was lying back," and somebody hit him on the arm and asked him what was the matter. He told them he was sick and asked them to let him lie on the floor for a few minutes, but they finished reading the paper. Chief Young asked him if he understood what was said, and he answered, "I say, 'Anything you all do is O. K. I would like to lie down.'"

He testified that he felt sick, that there was a time he did not know what was going on. He gave the answers because he wanted to help Mrs. Young and her family, but the answers were not true.

The following statements made by the defendant were each specifically denied by one or more of the state's witnesses, who testified regarding the securing of the confession:

The defendant testified that Mr. Clancy had stated that there were two witnesses at hand who would testify that they saw him coming from Mrs. Kennedy's apartment; that he never saw any of the butcher knives displayed to him, though he had packed up the Chief's household goods for moving to Roswell; that he had agreed to admit having killed Mrs. Kennedy before Chief Young was called into the room. In this regard he testified "I say, 'I don't know what you all is going to do with me but if it will please you all, if you all just want me to say yes, I will say yes.'" Defendant testified that he was afraid he would be assaulted if he did not admit the killing of Mrs. Kennedy; that he was not warned nor offered the services of an attorney prior to the signing of the confession; that he asked for permission to lie down on the floor when he became sick, but was not allowed to do so.

The examinations at the office of the City Police Captain and the inquest at the morgue were held for the purpose of a general inquiry, and all the testimony that could be obtained by the state was introduced. The only time, so far as the record shows, in which the defendant alone was examined was at the district attorney's office. There is no evidence in the record to indicate that the defendant was influenced by any of these examinations in making his confession.

It has been held a number of times by the Supreme Court of the United States that the mere questioning of a suspect while in the custody of police officers is not prohibited either as a matter of common law or due process. Lyons v. Oklahoma, 322 U.S. 596, 607, 64 S.Ct. 1208, 88 L.Ed. 1481, and cases cited therein. The trial judge heard the testimony in this case and the great weight thereof indicates that there was no unfair advantage taken of the defendant at any time. In fact he does not claim to have been coerced into making a confession, but states that he did so to keep the wife of Chief Young and others of her family from crying.

He protested his innocence until he was confronted with the blood-stained knife with which Mrs. Kennedy was killed, and this seemed to have so impressed him that after a short silence he stated, "I did it, I will tell you all about it." The examination only lasted thirty or forty minutes and he was not coerced, promised anything, or threatened. He was advised of all his constitutional rights. There was no such invasion of his constitutional rights as occurred in the cases decided by the Supreme Court of the United States, cited by the appellant, and they do not require a discussion here. The recent case of Lyons v. Oklahoma, supra, affirmed by the Supreme Court of the United States was much stronger in favor of the appellant than the one before us.

It is asserted that the verdict is without support in the evidence, in that express malice was not proved. We are of the opinion that the evidence amply supports the verdict of the jury. The knife in question was in the apartment of Chief Frank Young and the defendant had used it a day or two before for quartering a hog. He had access to that apartment and was working there just prior to the homicide. He stated in his confession that he had secured the knife and that he killed the deceased with it, but that he did not take it for that purpose; that he intended to cut some rags with it to use in waxing floors for Mrs. Flanigan. However in his examination before the jury he was asked:

"Q. You did not have a knife to cut rags? A. No sir, I did not have to have no knife to cut rags because the rags we used is sent to the state police station in wiping size, is already wipe rags.".

He denied when questioned in the penitentiary that he had ever seen the knives displayed to him there, but stated in his testimony before the jury that he knew there were knives in the Chief's house.

"Q. You have seen a knife just like that over there (in Chief Young's apartment)? A. I have seen some knives in Chief Young's house but I can't say I have seen one like that."

Now the jury was warranted in accepting his testimony in his confession to the effect that he took the knife from Chief Young's house with him to the apartment of Mrs. Kennedy; also his statement regarding the size of the pieces of cloth used for waxing floors, and that he did not get a knife to cut cloth. The jury was warranted in believing that he secured the knife which he put in his pocket, not for cutting rags, but to kill Mrs. Kennedy, if she refused to comply with his request for sexual intercourse. There could not be any other reasonable conclusion from the evidence. Also, there was no other person found, after an examination of all witnesses accessible to the police, that was at or near Mrs. Kennedy's apartment at the time the murder was committed. They were likewise warranted in believing from his tearing of her levis with other circumstances, that he attempted to, and may have, raped her. The defendant had human blood on his trousers, shoes, *undershirt and shorts*, and evidently her levis were torn from the waist to the knee before she was killed, and while facing him, as the torn place was in front and under her body when she was found dead face down on the bathroom floor. These facts and his admission to the District Attorney that he had intended to rape her, in addition to the wound in the vagina, indicate an attempt was made by defendant to rape her, or the jury might reasonably have so concluded.

We have stated that the jury was justified under the evidence in finding express malice, and we will now elaborate somewhat upon our reasons.

The following are New Mexico statutes regarding murder:

"Murder is the unlawful killing of a human being, with malice aforethought, either express or implied. The unlawful killing may be effected by any of the various means by which death may be occasioned." Sec. 41-2401, N.M.Sts.1941.

"Express malice is that deliberate intention, unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof." Sec. 41-2402, N.M.Sts.1941.

"Malice shall be implied when no considerable provocation appears, or when all circumstances of the killing show a wicked and malignant heart." Sec. 41-2403, N.M. Sts.1941.

"All murder which shall be perpetrated by means of poison or lying in wait, torture, or by any kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration of or attempt to perpetrate any felony, or perpetrated from a deliberate and premeditated design unlawfully and maliciously to effect the death of any human being, or perpetrated by any act greatly dangerous to the lives of others, and indicating a depraved mind regardless of human life, shall be deemed murder in the first degree; and all other kinds of murder shall be deemed murder in the second degree." Sec. 41-2404, N.M.Sts.1941.

It has been said that the only difference between express malice and implied malice is the manner of proof; each means "That condition of the mind which prompts one person to take the life of another without just cause or provocation, and it signifies a state of disposition which shows a heart regardless of social duty and fatally bent on mischief." Lewis v. Chapman, 16 N.Y. 369; Craft v. State, 3 Kan. 450; United States v. King, C.C., 34 F. 302.

But the New Mexico statutes define two kinds of malice, (1) express malice, in which *deliberation* is an essential element, and which is manifested by external circumstances capable of proof; and (2) implied or common law malice.

The distinction between the two was elaborately considered in State v. Smith, 26 N.M. 482, 194 P. 869, and State v. Sanchez, 27 N.M. 62, 196 P. 175. In Torres v. State, 39 N.M. 191, 43 P.2d 929, 931, we reviewed the Smith and Sanchez cases, stating:

"State v. Smith, [26 N.M. 482, 194 P. 869,] has been often cited to the proposition that the true distinction between murder in first degree and murder in the second degree is in the kind of malice present. If it be the ordinary malice aforethought of

the common law, it is murder in the second degree. But if it be 'intensified malice,' a 'deliberate intention unlawfully to take away the life of a fellow creature,' it is murder in the first degree; that 'kind of murder * * * deemed more atrocious than others'; not to be implied as a matter of law 'when no considerable provocation appears or when all the circumstances of the killing show a wicked and malignant heart'; but to be proven by external circumstances 'raising' the offense to that grade of enormity for which the statute reserves the extreme penalty. This is the result to which many readings of this decision and much reflection bring us.

"Just a little later the same author and the same concurring justices reduced the matter to this: Murder in the second degree is 'murder with malice, but without deliberation.' Malice includes 'premeditation'. Deliberation is more than mere premeditation, and is the distinguishing characteristic of murder in the first degree. State v. Sanchez, 27 N.M. 62, 196 P. 175.

\* \* \* \* \* \*

" 'Premeditation,' as said in the Smith decision, means merely 'thought of beforehand.' That meaning has led the courts from time immemorial to give the stock instruction that the intent to kill, if entertained but for a moment, is sufficient. But 'deliberation,' as said in the Smith case, means 'a thinking over with calm and reflective mind.' A little later this court employed the slightly different expression, 'fixed and settled deliberation and coolness of mind.' State v. Kile, 29 N.M. 55, 218 P. 347, 352."

The question here is whether there is evidence in the record, consisting of proof of external circumstances, from which the jury was justified in finding that the defendant formed a design to kill deceased after thinking the matter over with a calm and reflective mind, and carried out such design. There can be no question but that malice in the common law sense was proved; for that is implied, or the jury was authorized to so find, from the detailed circumstances of the crime.

The following facts proved express malice:

The defendant was working in the Frank Young apartment on the morning of the homicide. He there conceived the design of having intercourse with the deceased, with or without her consent. He stated to the district attorney that he intended to rape her, although he stated in his confession that he would not have done so. That he intended to rape her, is shown further by the fact that he tore her levis from the waist to the knee. That he may have raped her (though he did not complete this act) was shown by the laceration in the vagina, and the blood on his shorts and undershirt. He was a negro convict and must have realized that it was so im-

probable the deceased would submit herself to him, that to accomplish his purpose he would almost certainly have to resort to force. He weighed these probabilities and determined that he would rape her (unless, as a remote possibility, she would submit), and then slay her. This is proved by the fact that he armed himself with a butcher knife that he knew was in the Young apartment, and put it in his pocket. He stated in his confession that when deceased threatened to "tell on him," he stabbed her as fast as he could strike, that "I just don't know how it happened, it was done so quick." He had no other use for the knife, according to his own testimony before the jury, which contradicted his statement in his confession that he got the knife to cut waxing cloth. He had an abundance of time to, and did, calmly and deliberately plan his crime. The unexpected presence of Mrs. Flanigan may have interrupted his design to rape.

The jury was warranted, from the facts herein stated, in finding that the defendant was the murderer; that express malice was proved, and that the murder was committed with deliberation.

The judgment of the district court should be affirmed.

It is so ordered.

LUJAN, and SADLER, JJ., and LUIS E. ARMIJO, District Judge, concur.